IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

FILED
LODGED
RECEIVED

NOV 22 2013

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>          RESPONDENT | ) )· ) ) ) ) ) ) ) ) | CIVIL NO: 13-CV-1997-MJP<br><br>CRIMINAL NO: 2:06CR00157MJP-001 |
| V.<br><br>HENRY C. ROSENAU,<br>         MOVANT | | |

---

**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY**

---

Henry C. Rosenau
#41168-086
NEOCC
2240 Hubbard Road
Youngstown, Ohio, 44505

13-CV-01997-SUP

## TABLE OF CONTENTS

1- SUPPLEMENTAL BRIEF - INTRODUCTION                                        1

2- CASE SUMMARY                                                            2

3- GROUND ONE: INEFFECTIVE ASSISTANCE OF COUNSEL                           4

4- GROUND TWO: VIOLATION OF DUE PROCESS RIGHTS, RULE OF SPECIALTY, EXTRADITION   10

5- GROUND THREE: VIOLATION OF EQUAL PROTECTION AND DUE PROCESS RIGHTS      14

   ALLEYNE VIOLATIONS REGARDING MANDATORY MINIMUM ENHANCEMENT

6- CONCLUSION                                                              15

7- TABLE OF AUTHORITIES AND STATUTES                                       16

8- TABLE OF CONTENTS, EXHIBITS                                             17

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,       )

                   )

         RESPONDENT     )    CIVIL NO: 13-CV-1997-MJP

                   )

  V.                )

                   )    CRIMINAL NO: 2:06CR00157MJP-001

HENRY C. ROSENAU,        )

                   )

         MOVANT        )

SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION UNDER 28 U.S.C. §2255
TO VACATE, SET ASIDE, OR CORRECT
A SENTENCE BY A PERSON IN FEDEAL
CUSTODY

I, Henry C. rosenau, the above mentioned Movant, do hereby approach this Court acting

Pro-Se, and submit this Brief in Support of Motion Under 28 U.S.C. §2255 to Vacate, Set

Aside, or Correct a Sentence by a Person in federal Custody.

I attest that I am not a learned man of the law, and am not professionally trained

in the manner of filing briefs, motions, and other legal documents in the Court. I have

not been trained in the proper articulation of legal arguments, and may not be able

at times to fully articulate complex legal theorems. As such, I would ask this court to

liberally construct this Motion as well as the brief and any other filings to give them

the greatest possible impact with regards to any ground which may lead to mitigation of

the sentence imposed or constitutional violations alleged. I would ask that this court

not hold me to the stringent standards of an attorney at bar, and that my inability to

meet the exacting criteria of a professional lawyer not be held against me.

## CASE SUMMARY

I was convicted under an indictment which had been filed in the Western District of Washington under criminal case number 2:06CR00157MJP-001. Under the indictment I was charged with Conspiracy to Import Marijuana (Count 1), Conspiracy to Distribute Marijuana (Count 2) and Possession of Marijuana with intent to Distribute (Count 3). Since I am a Canadian citizen and in internation arrest warrant was placed against me I was originally detained by the Royal canadian Mounted Police at the request of the United States government. I was then subjected to extradition proceedings. The records will show that there were issues at several points with regards to my extradition, including a false submission by the United States Attorney's office which was easily discredited, and which demonstrated a tendency of the government to overreach, at least with regards to my prosecution.

Eventually, extradition was granted, and I was extradited to the United States to face the charges which had been presented to the Canadian authorities when determining whether to extradite me to the United States.

I proceeded to take this matter to trial, and this resulted in a hung jury. A second trial had been scheduled for July 10th, 2012, yet at the last minute a plea agreement was entered into and was formally filed with the Courts on July 11, 2012. This agreement was such last minute that the Court hadn't even been notified of this occurance and had believed that the trial was to proceed as had been scheduled. Unfortunately, the hasty plea agreement had several contradictions and forfeitures of protections which would have been caught had the process been more timely. As it was, I was scheduled for sentencing on November 7, 2012.

Prior to this sentencing the United States Probation Office created its Presentence Investigation Report which found that my Adjusted Offense Level would be 36, for a sentencing guidelines range of 188 months to 235 months. My attorney submitted a sentencing memorandum on November 1, 2012, and I was sentenced on November 7, 2012 to a term of imprisonment of 120 months, and 4 years supervised release.

I then applied for transfer via the international transfer of offenders act/Treaty Transfer regulations and was denied by the United States. I then sought reconsideration,

but was again denied.

On November 5, 2013, my Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody was filed under case number 13-cv-1997-MJP. This motion was filed prior to the November 7, 2013 deadline for filing a §2255 motion should the date of tolling have been deemed November 7, 2012, and would have been more than timely for a tolling date of November 21, 2012, had the Court determined the toling date have been the last date that an appeal could be filed.

This brief is submitted in support of the Motion under §2255, and in sum total with the motion comprise the full initial filing in this matter.

**GROUND ONE: Ineffective Assistance Of Counsel**

First and foremost, I believe that I was the victim of constitutionally deficient assistance of counsel which would meet the criteria for the correction and vacation of the sentence imposed and resentencing under the proper calculations and standards.

When making a determination of whether or not ineffective assistance of counsel has risen to the level of being a constitutional violation, the Courts have historically adhere to the 2 prong test for effective assistance of counsel which was proscribed in Strickland V. Washington, 104 S.Ct. 2052. This stated that for deficient performance to be proven, and to meet the criteria of having been a constitutional violation, there must be a prejudice as well as deficient performance. The prejudice has to be specifically enumerated, and with regards to the performance, the standard set is that the performance must fall far below a reasonable professional standard. I believe that in this instant offense I can prove that I meet both criteria, and as such should be entitled to relief based in ineffective assistance of counse.

The Sixth Amendment of the United States Constitution requires effective assistance of counsel at various stages , including during sentencing (Glover V. United States, 121 S.Ct. 696)

These standards were further enforced under the companion cases Lafler V. Cooper, 132 S.Ct. 1376, and Missouri V. Frye, 132 S.Ct. 1399, which reinforced the concept that effective assistance of counsel has to be present at all critical stages even if the result of the proceedings is a plea agreement, as my case ended up being resolved.

The basis of my contention is that I entered into a plea agreement with the United States under misrepresented beliefs which turned out to be false, as well as my counsel having had me, through the plea agreement, forfeit many protections which I was entitled to, including but not limited to protection of the Rule of Specialty in Extradition Proceedings as well as the right to proceed to trial.

The first issue I would like to bring to the forefront is that, according to Page 1 of the Plea greement, it stated "enters his plea of guilty to Count 1 as contained in the Superseding Indictment, that is, to Conspiracy to Import Marijuana, but to a lesser

quantity of at least 100 kg of Marijuana, in violation of Title 21, United States Code,
Sections 952, 960(a)(1) and (b)(2) and 963." Under the penalties section of the plea
agreement, Page 3, section 3 it states "The defendant understands that the statutory penalties
for the offense are imprisonment of not less than five (5) years and not more than forty (40)
years.." It also states that "the United States must prove beyond a reasonable doubt that
the offense involved 100 kilograms or more of marijuana. Defendant waives the right to
require the United States to make this proof at trial and stipulates that this plea of
guilty includes Defendant's acknowledgement that the offense involved 100 kilograms or more
of marijuana".

Any reasonable person, when reading these statement, would assume that the government was
guaranteeing that they would not pursue an sentence for more than the 100 kilogram or more
of marijuana, as stated several times in the opening 2 pages. Also, the inclusion of the
staturoy sentence language indicates that the government, as well as the defense attorney,
had led me to believe that I was pleading guilty to an offense which would result in a
mandatory minimum 5 year sentence, and not an enhance mandatory minimum 10 year sentence, or
a sentence involving extra-indictment and extra-plea agreement drug quantities which
were not stipulated to.

Furthermore, on page 5 of the plea agreement, the specific offense characteristic was
enumerated, namely that "A fraction of the marijuana loads smuggled by this group was
seized by the United States law enforcement, including a 485 pound load on June 9, 2005,
a 500 pound load on August 4, 2005, and a 1,100 pound load on September 21, 2005." Then,
according to page 6 of the plea agreement, Section 8 Sentencing Factors, "A base offense
level of at least level 30, corresponding to at least 945 kg of marijuana that was seized
as discussed above, pursuant to USSG §2D1.1(c), but the parties each reserve the right to
argue for or against additional relevant conduct as defined in USSG 1B1.3 that, if found
by the Court, could result in an increase in the defendant's base offense level."

Firstly, the drug amount directly stipulated to, the 945kg, should have been the maximum
amount which could have been placed against me in order to rationalize a statutory minimum
sentence of 5 years, as stipulated on page 1, since an increase over 1,000kg would immediately

-5-

result in a 10 year mandatory minimum, and would have had to be stipulated in the plea agreement to be valid. Also, the fact that a relevant conduct waiver was placed in the plea agreement in and of itself should be grounds for ineffective assistance of counsel as relevant conduct is not allowed under the Rule of Specialty as pertains Extradition cases between the United States and Canada.

By allowing this waiver, my attorney waived a protection that he had no right to waive, and resulted in an enhanced sentence. (Ground Two elaborates on the Rule of Specialty and should be taken in conjunction with Ground One).

Defense COunsel then agreed to have me waive further rights when it stipulated, in the same section, under subsection "b. The parties agree they are free to argue the application of any other provisions of the United States Sentencing Guidelines. In so doing, <u>the parties</u> <u>are not limited to just the facts included in this Plea Agreement.</u> Defendant understands that at the time of sentencing, the Court is free to reject these stipulated adjustments, and is further free to apply additional downward or upward adjustments in determining Defendant's sentencing Guideline range."

By allowing this further stipulation, defense counsel effectively allowed for an overly complicated sentencing structure which resulted in various attempts to upwardly enhance the sentence, and secondary efforts to try to mitigate those upward departures. This ultimately resulted in my receiving a Pre Sentence Investigation Report Offense Level of 36, which corresponded to a sentencing range of 188 to 235 months due to an adjusted base offense level of "1000 kilograms but not less than 3000 kilograms" due to the relevant conduct enhancement, which led to a base offense level of 32 (As opposed to a base offense level of 30 for the 945 kilograms that should have been the maximum allowed) Also, the government had made no stipulation that it was intending to enhance my sentence due to the firearm adjustment and the specific offense characteristic of flying a helicopter, which should have been stipulated directly in the plea agreement in order to be used to enhance my sentence of imprisonment. Lastly, I was given a 2 level enhancement for obstruction of justice, which could not have been used against me since it violates the Rule of Specialty as it is an offense characteristic which occured <u>after</u> extradition occured, and is therefore

-6-

precluded from being used to punish me further for my crime, as the RUle of Specialty, as enumerated in Ground 2, specifically provides protection for punishable crimes which occur after extradition occurs, specifying that only the crimes for which extradition was sought can be prosecuted and punished. THis led to a pre-downward departure Offense Level of 38, which was mitigated by the 2 level downward departure which was specifically stipulated in the plea agreement, under section 8b. "A two-level reduction for Acceptance of Responsibility, if Defendant fulfills his obligations set forth in USSG §3E1.1(a).

Ultimately, I went through the sentencing phase of the criminal process at a severe disadvantage due to my counsel's ineffective assistance.

Also, as a condition of my pleading guilty, the plea agreement stipulates in page 7, "Defendant agrees to dismiss, and agrees not to file at a later time, any lawsuit(s) in courts in Canada or the United States against law enforcement officers or prosecutors stemming from this case and his extradition. Defendant agrees such suits are frivolous, and agrees to take all steps necessary and ensure that all such suits that have already been filed are finally dismissed prior to sentencing on this matter." This was a benefit to the government which was not reciprocated towards myself, as they gained the freedom from prosecution for possible infractions, and I was still subjected to an attempt to enhance my sentence to a disproportionally high level under grounds which were not valid.

A further contradiction which was present in the plea agreement was also on page 7, where it stipulates "The United States agrees to take no position with regard to any request by Defendant for a treaty transfer made pursuant to a valid treaty with Canada." and then states on Page 9, Section 15 "The United States and the defendant acknowledge that these terms constitute the entire Plea Agreement between the parties. This agreement binds only the United States Attorney's Office for the Western District of Washington. It does not bind any other United States Attorney's Office or any other office or agency of the United States, or any state or local prosecutor." Exhibits 6 and 7 show that my request for a transfer was denied the the United States Department of Justice, which is under the jurisdiction of the United States Attorney General, and these prior stipulation directly allowed me to be deceived as to the likelihood of a transfer being accepted, and

-7-

resulted in yet another believed promise in the plea agreement being broken.

In summary, I was led to believe several things when entering the plea agreement which did not occur.

1- That I would be subject to a 5 year mandatory minimum sentence.

2- That I would be held accountable for the drug quantity stipulated in the Plea Agreement, More then 100KG but no More than 945 KG.

3- That no other enhancements would be used against me which weren't stipulated in the plea agreement.

4- That if I abided by the terms of the plea agreement I would be granted a transfer back to Canada as the United States would not oppose the transfer.

Also in summary, I waived several valuable protections which counsel should have protected.

1- Protection from prosecution for post-extradition offenses.

2- Protection of the U.S. CANADA Extradition Treaty's Rule of Specialty.

3- Protection against frivolous enhancements which raised mandatory minimum and guidelines minimum sentences.

4- Protection to be allowed to file uit for constitutional deprivation of rights.

5- Protection against being prosecuted and sentenced without proper notice.

Counsel's conduct fell well below a reasonable level of professionalism as he allowed me to enter into a plea agreement which was severely contradictory and misleading, and which forced me to forfeit too many rights and freedoms while gaining no security from the United States governent in return. Counsel's conduct also fell well below a reasonable standard as he did not appraise himself of the intricacies of the United States Canada Extradition Treaty, which as shown inGround Two, would have provided me great protections and would have necessit- ated a reduced guidelines range and sentence. Counsel's performance also fell below a reasonable standard as this was a last minute plea agreement which was entered into without, obviously, his having fully reviewed it for discrepancies, and which resulted in his having to play catch up throughout the post conviction yet pre-sentencing phase, as demonstrated by the exhaustive sentencing memorandum which he provided trying to justify a downward departure from the 188-235 month guidelines range to a 5 years sentence, which would have been an

unheard of 66% to 75% sentence reduction below the advisory guidelines range. Yet had counsel not failed to protect my rights and freedoms as stipulated, I would have entered this constitutionally protected phase with an advisory guidelines range of 78-97 months, based on an adjusted offense level of 28, and for which a entencing memorandum requesting downward variance to 5 years would have been more reasonable, as it would have resulted in a downward variance/departure of at most 40% (97 minus 37 to make 60 months).

Counsel's performance directly prejudiced the proceedings as, without the protections inherent in the Rule Of Specialty, as well as the other factors enumerated above, I was subjected to an ehanced sentencing guidelines rnage of 188 to 235 months, which forced excessive arguments and, although it resulted in a sentence of 120 months, could have been much lower had the Court not been forced to try to justify a downward departure of 68 months below the guidelines minimum and 115 months below the guidelines maximum.

Also, had the Court been given the Sentencing Guidelines calculation which I have stipulated, namely an offense level of 28, the likelihood is the maximum sentence I could have received would have been 97 months, as I would no longer have been subjected to a 10 year mandatory minimum due to a drug quantity of no more than 945, and no less than 100 kilograms.

As such, I believe that my counsel's performance did fall below a reasonable objective standard and I do believe that his performance greatly affected the outcome of the proceedings, resulting in my receiving an excessively long sentence and forfeiting many rights which no reasonable person would have forfeited. As such, I believe that this ground in and of itself has merit, and taken in conjunction with Ground Two, provide a strong enough basis for granting of request for habeas relief and a reduced sentence, with my  contention being that a 5 year mandatory minimum sentence would be appropriate, and that at the very least I should be entitled to a sentence within the 78-97 month range stipulated.

**GROUND TWO: Violation Of Due Process Rights, Rule Of Specialty, Extradition**

Firstly, since I am in this Country via Extradition, I fall under the rules and regulations set forth by the United States-Canada Extradition Treaty as well as under the auspices of the Rule Of Specialty.

Firstly, the Extradition Statute, 18 U.S.C. §3184, limits extradition to instances where a treaty is in force between the requesting state. In the case of United States V. Rauscher, 199 U.S. 407 (1886) the Rule Of Specialty was created which states that a government is prohibited from prosecuting an individual for an offense in the country that requested extradition unless the extraditing country grants his extradition for that offense, and in effect this bars prosecution for unextradited crimes.

Under the Doctrine, the United States' prosecution of petitioner is limited by the terms of the extradition treaty between the United States and Canada. The relevant treaty between these two governments provides:

ARTICLE 12

(1) A person extradited under the present treaty shall not be detained, tried, or punished in the territory of the requesting state for an offense other than that for which extradition has been granted...unless:
(1) He has left the territory of the requesting state after his extradition and has voluntarily returned to it;
(ii) He has not left the territory o f the requesting state within 30 days after being free to do so; or
(iii) The requested state has consented to his detention, trial, punishment for an offense other than that for which extradition was granted... provided such other offense is covered by Article 2.
(2) The foregoing shall not apply to offenses committed after the extradition.
(Treaty on extradition Between the United States and Canada, Dec. 3, 1971.)

Also, according to the Schedule enumerated under article 2 of the treaty, it enumerates what offenses can be punished based on dual criminality. #26 states "offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drug, Cannabis Sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine, and its derivatives."

The critical concern underlying the principle of specialty is that extradited individuals should not be subject to indiscriminate prosecution by the receiving government. (Malik V U.S. Parole Commission, 4:12cv2721, citing Ficcione V. Atty. Gen. Of United States, 462 F.2d 475 (2nd Cir) (6th Cir.))

-10-

It is my belief that there have been several instances where the Rule of Specialty has either been violated, or that there is enough ambiguity to find, via the Rule of Lenity, that a decreased sentence would have been appropriate.

Firstly, the extradition agreement basically states that I am to be charged and sentenced based on only indicted offenses, since the Indictment which was placed against me stated specifically what the United States planned on prosecuting me for. This was indirectly superceded when a plea agreement was presented which stated that a mitigating punishment was to be placed upon me, and the terms were directly set forth in the plea agreement. This included the specific amount that I was to be convicted of, which coordinated with the indictment which was submitted to the Canadian Authorities, namely the 945 KG of Marijuana, acocrding to a "lesser quantity of at least 100 KG of Marijuana" (Plea Agreement, Page 1)

According to the extradition treaty, I could only be prosecuted for crimes for which extradition was specifically requested, and that was for the indicted offenses. When the government chose to offer a plea agreement citing only Count One, they effectively precluded using any relevant conduct to enhance the drug quantity, as it would then fall out of the purview of the Plea Agreement and Indictment.

Also, I would like to argue that Relevant Conduct enhancements, in and of themselves, should be precluded as a means to enahnce a sentence based on the extradition agreement as every aspect of the crime must be enumerated in order to allow the extraditing government an opportunity to determine whether to grant extradition, and Relevant Conduct is an offense characteristic which was not brough forth as a specific ground for extradition, therefore any relevant conduct enhancements should be stricken from any calculations or consideration.

Secondly, the treaty states that'(2) the foregoing shall not apply to offenses committed after the extradition.' Now, according to the Pre-Sentence Investigation Report, I received a 2 level enhancement to my Guideines Range calculation for Obstruction of Justice. Since the Obstruction of Justice occured after the extradition had been granted, the 2 level enhancement became punishment for an offense, obstruction of justice, which occured after extradition, and should be stricken from any calculations or considerations

-11-

when determining a sentence.

Thirdly, since specific enhancements were not enumerated in the Extradition Request, via the indictment, with regards to the Guidelines Enhancement for possession of a firearm of 2 levels, as well as the specific offense characteristic of using specialized abilities, ie piloting a helicopter, which led to another 2 level enhancement, that these enhancement should be questioned as to whether or not they fell directly within the offense conduct for which extradition was requested. And although I admit that the request submitted by the United States to Canada makes mention of these factors, namely the possession of a firearm and the use of a helicopter, it was not specifically stated that I would be facing punishment for these actions in and of themselves, nor was it brought to discussion whether extradition should be granted on these specific sentence enhancements.

Lastly, the indictment, as it was presented, would have given a specific snapshot of what the penalty would be should Extradition have been granted. This included the type of sentence of available (5 years mandatory minimum to 40 years mandatory maximum) a specific amount of drugs to be charged with (Plea agreement stipulates to reduced minimum 100KG, 945KG maximum), and should have included any factors which would have led to an enhanced sentence (Dual criminality and comity are factors which are supposed to be considered when granting extradition.) Did the extraditing country, Canada, receive any proper notice that the sentence would be enhanced due to the Guidelines enhancements which were used against me to enhance my sentence? Does Canada have the same types of sentence enhancements for these crimes, and if so, was Canada allowed to consent to these enhancements when making a determination of whether to extradite. I contest that these issues were not specifically requested when the extradition request was submitted as they were not part of the indictment, and as such these enhancements should be stricken and should not be used when considering a sentence.

Should these factors have been correct, I would have been entitled to a Base Offense Level of 30, due to the maximum quantity of 945 KG of Marijuana. Since the Obstruction of Justice firearm and specific offense characteristics would not have fallen within the terms of the extradition agreement, this would have resulted in a pre-downward variance Guidelines Level

of 30. Since I received a 2 level downward departure for acceptance of responsibility, as stipulated in the Plea Agreement, my total offense level would have been 28, and this would have resulted in a Guidelines Range of 78-97 months, well below the PreSentence Investigation Report  guidelines level of 36 and a Guidelines Range Sentence of 188-235 Months. Also, since the amount would have fallen below the 1000KG threshhold which triggers a mandatory minimum, I would have been entitled, based on these guidelines, to a sentence of 78-97 months, and would have been eligible for further downward variance as the mandatory minimum would have been 5 years instead of the 10 that it became due to the addition of Relevant Conduct weight.

As such, I believe that this ground has merit, and should be considered when making a determination as to whether I am entitled to a reduced sentence.

**GROUND THREE:** Violation Of Equal Protection And Due Process Rights, Allyene Violations
Regarding Mandatory Minimum Enhancement

As a tertiary ground which I would like for this court to consider, I would like to

bring to this Court's attention the recent ruling by the United States Supreme Court

in the matter of Alleyne V. United states, where the Supreme Court stated that not

only a mandatory maximum but also a mandatory minimum sentence would have to be subject

to a jury's finding. As such, any enhancement that would raise a mandatory minimum would

have to be either brought before a jury, at trial, and by a preponderance of evidence, would

have to be proven by the government, and the jury would have to unanimously agree with the

government.

I believe this should also apply to plea agreements, as the terms presented in the

plea agreement stipulate what would have been found by a trial jury had the matter proceeded

to trial.

In my instance, the government specifically stated that they would prove the"lesser

quantity of no less than 100 kg", which results in a Mandatory Minimum of 5 years, and

not the 10 years which was triggered by the relevant conduct in my case, which brough

my quantity above the 1000 kilogram threshhold.

I believe that the plea agreement specifically states what would have been found by

a jury trial, namely that I was guilty of Conspiracy to Import Marijuana, but to a lesser

quantity of at least 100 kg of marijuana, in violation of 21 United States Code, Sections

952, 960(a)(1) and (b)(2) and 963, as stipulated in the plea agreement. As such, I should

not be held to the 10 year mandatory minimum, and should be subject to the 5 year mandatory

minimum stipulated in Section 3 of the Plea Agreement.

I believe that this ground also has merit, and should be considered for habeas relief

in the form of a reduction of sentence below the 10 year mandatory minimum enacted and

to the more appropriate 5 year mandatory minimum, as stipulated in the plea agreement.

## Conclusion

I therefore humbly request this Court to review this matter and the facts presented herein, and should the Court determine that the grounds raised provide for the relief sought, that the Court consider granting a writ of habeas corpus in order to correct the sentence as requested. I would ask that this Court consider a reduced sentence of 5 years or as close to the 5 year Mandatory minimum as possible, or that this Court consider compelling my Transfer to Canada, or any other correction of my sentence and the terms of imposition that the COurt would deem appropriate to provide me the relief sought.

Should this Court determine that this motion and brief would be detrimental to myself, I would ask that the Court dismiss this petition and allow the current sentence to be the one imposed.

Respectfully Submitted

Henry C. Rosenau
#41168-086
NEOCC
2240 Hubbard Road
Youngstown, Ohio, 44505

11/18/13

Date

-15-

## TABLE OF AUTHORITIES AND STATUTES

Table Of Statutes

21 U.S.C. § 952
21 U.S.C. §960 (a)(1)
21 U.S.C. §960 (b)(2)
21 U.S.C. § 963
U.S.S.G. §2D1.1
U.S.S.G. §2D1.1 (c) Drug Quantity Table (4) & (5)
U.S.S.G. §2D1.1 (b) Specific Offense Characteristics
U.S.S.G. §1B1.3
18 U.S.C. §3184
Treaty on extradition Between the United States and canada, Dec. 3, 1971


Table Of Authorities
Strickland V. Washington, 104 S.Ct. 2052
Glover V. United States, 121 S.Ct. 696
Lafler V. Cooper, 132 S.Ct. 1376
Missouri V. Frye, 132 S.Ct. 1399
United States V. Rauscher, 199 U.S. 407 (1886)
Malik V. United States Parole Commission, 4:12cv2721, ND Ohio
Ficcione V. Atty Gen. Of United States, 462 F.2d 475
Alleyne V. United States, 133 S.Ct.

TABLE OF CONTENTS
EXHIBITS

Exhibit 1 - Plea Agreement, CR06-157MJP, Filed 7/12/2012

Exhibit 2 - Sentencing Memorandum, Craig Platt, November 1, 2012

Exhibit 3 - Indictment, CR06-0157MJP, May 11, 2006

Exhibit 4 - Certification of Record of the Case for Prosecution, April 9, 2007

Exhibit 4 - Certification Of Supplemental Record of the Case for Prosecution,
    October 7, 2008

Exhibit 5 - Certification Of Second Supplemental Record of the Case for Prosecution,
    February 5, 2009

Exhibit 6 - Decision, U.S. Department Of Justice, Criminal Division, Office of Enforcement
    Operations, International Prisoner Transfer Unit, Paula Wolff, Chief, June 26, 2013

Exhibit 7 - Response to ReconsideratioN request, U.S. Department of Justice, Criminal
Division, Office of Enforcement Operations, International Prisoner Transfer Unit,
September 9, 2013.

C13-2130MJP

NOV 22 2013

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

# EXHIBIT 1

13-CV-02130-EXH

International Transfers
Transferences Internationaux

DEC 0 3 2012

File no / dossier

Chief Judge Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA, )
                              )
                    Plaintiff, )        No. CR06-157MJP
                              )
        v.                    )        **PLEA AGREEMENT**
                              )
HENRY C. ROSENAU,            )
                              )
                    Defendant. )
_____ )

The United States of America, by and through Jenny A. Durkan, United States Attorney

for the Western District of Washington, and Susan M. Roe and Marc Perez, Assistant

United States Attorneys for said District, and Defendant, Henry C. Rosenau, and his attorney,

Craig Platt, enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure

11(c):

1.    **The Charges.**  The defendant, having been advised of the right to have this matter

tried before a jury, agrees to waive that right and enters his plea of guilty to Count 1 as contained

in the Superseding Indictment, that is, to Conspiracy to Import Marijuana, but to a lesser quantity

of at least 100 kg of marijuana, in violation of Title 21, United States Code, Sections 952,

960(a)(1) and (b)(2) and 963.  By entering this plea of guilty, the defendant hereby waives all

objections to the form of the charging document.  He further understands that before entering his

1  plea of guilty, he will be placed under oath. Any statement given by the defendant under oath

2  may be used by the United States in a prosecution for perjury or false statement.

3     **2.**    **Elements of the Offense.** The elements of the offense of Conspiracy to Import

4  Marijuana, as charged in Count 1, in violation of Title 21, United States Code, Sections 952,

5  960(a)(1) and (b)(2) and 963 are:

6    (1) That there was an agreement between two or more people to commit the acts that

7  constitute a crime, that is, to import marijuana from Canada into the United States; and,

8    (2) That the defendant became a member of the conspiracy knowing of its object and

9  intending to help accomplish it.

10     **3.**    **The Penalties.** The defendant understands that the statutory penalties for the

11  offense are imprisonment of not less than five (5) years and not more than forty (40) years, a fine

12  of up to five million dollars ($5,000,000), a period of supervision following release from prison

13  of at least four (4) years, and a special assessment of one hundred dollars ($100). The defendant

14  agrees that the special assessment shall be paid at or before the time of sentencing.

15    Defendant further understands that, in order to invoke the statutory sentence set forth

16  above, the United States must prove beyond a reasonable doubt that the offense involved

17  100 kilograms or more of marijuana. Defendant waives Defendant's right to require the United

18  States to make this proof at trial and stipulates that this plea of guilty includes Defendant's

19  acknowledgment that the offense involved 100 kilograms or more of marijuana.

20    The defendant understands that supervised release is a period of time following

21  imprisonment during which he will be subject to certain restrictions and requirements. The

22  defendant further understands that if supervised release is imposed and he violates one or more

23  of its conditions, he could be returned to prison for all or part of the term of supervised release

24  that was originally imposed. This could result in him serving a total term of imprisonment

25  greater than the statutory maximum stated above.

26

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    The defendant further understands that a consequence of pleading guilty may include the

2  forfeiture of certain property either as a part of the sentence imposed by the Court, or as a result

3  of civil, judicial, or administrative process.

4    The defendant understands that, as a non-citizen of the United States, entering a guilty

5  plea may have consequences regarding his immigration status. Certain crimes are deportable

6  offenses, and a plea of guilty to any such crime may subject the him to automatic deportation and

7  removal from the United States. *See* 8 U.S.C. § 1227(a)(2). The defendant affirms that he has

8  been advised of the potential immigration consequences that may result from the entry of the

9  guilty plea contemplated by this agreement and is prepared to proceed with his guilty plea

10 regardless of any immigration consequences that may result from  guilty plea, even if such

11 consequences include automatic deportation and removal from the United States.

12    The defendant agrees that any monetary penalty the Court imposes, including the special

13 assessment, fine, costs, or restitution, is due and payable immediately and further agrees to

14 submit a completed Financial Statement of Debtor form as requested by the United States

15 Attorney's Office.

16

17    **4.    Rights Waived by Pleading Guilty.** The defendant understands that by pleading

18 guilty, he  knowingly and voluntarily waives the following rights:

19        a.    The right to plead not guilty and to persist in a plea of not guilty;

20        b.    The right to a speedy and public trial before a jury of his peers;

21        c.    The right to the effective assistance of counsel at trial, and, if he could not

22 afford an attorney, the right to have the Court appoint an attorney for him;

23        d.    The right to be presumed innocent until guilt has been established beyond a

24 reasonable doubt at trial;

25        e.    The right to confront and cross-examine witnesses against him at trial;

26        f.    The right to compel or subpoena witnesses to appear on his behalf at trial;

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

International Transfers
Transferements Internationaux

DEC 0 3 2012

File no / dossier

1       g.     The right to testify or to remain silent at trial and his silence could not be

2 used against him at trial; and

3       h.     The right to appeal a finding of guilt or any pretrial rulings.

4     **5.**     **United States Sentencing Guidelines.**  The defendant understands and

5 acknowledges that, at sentencing, the Court must consider the sentencing range calculated under

6 the United States Sentencing Guidelines, together with the other factors set forth in Title 18,

7 United States Code, Section 3553(a), including:  (1) the nature and circumstances of the offense;

8 (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the

9 seriousness of the offense, to promote respect for the law, and to provide just punishment for the

10 offense; (4) the need for the sentence to afford adequate deterrence to criminal conduct; (5) the

11 need for the sentence to protect the public from further crimes of the defendant; (6) the need to

12 provide the defendant with educational and vocational training, medical care, or other

13 correctional treatment in the most effective manner; (7) the kinds of sentences available; (8) the

14 need to provide restitution to victims; and (9) the need to avoid unwarranted sentence disparity

15 among defendants involved in similar conduct who have similar records.  Accordingly, he

16 understands and acknowledges that:

17       a.     The Court will determine his applicable Sentencing Guidelines range at the

18 time of sentencing;

19       b.     After consideration of the Sentencing Guidelines and the factors in

20 18 U.S.C. 3553(a), the Court may impose any sentence authorized by law, up to the maximum

21 term authorized by law;

22       c.     The Court is not bound by any recommendation regarding the sentence to

23 be imposed, or by any calculation or estimation of the Sentencing Guidelines range offered by

24 the parties or the United States Probation Department, or by any stipulations or agreements

25 between the parties in this Plea Agreement; and

26       d.     The defendant may not withdraw a guilty plea solely because of the

27 sentence imposed by the Court.

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   **6.      Ultimate Sentence.** The defendant acknowledges that no one has promised or

2   guaranteed what sentence the Court will impose.

3   **7.      Statement of Facts.** The parties agree on the following facts. The defendant

4   admits he is guilty of the charged offense.

5   In the five years leading up to and including September 21, 2005, Henry C.

6   Rosenau was involved with other Canadian marijuana growers, dealers and transporters in

7   bringing marijuana into the United States for distribution here. Rosenau was important because

8   he was an experienced helicopter pilot who could fly people and marijuana across the United

9   States - Canadian border. Rosenau owned, possessed, controlled or flew different helicopters

10   during this time period, including a Robinson R-44 helicopter, tail identifier C-FRKM, a Bell

11   206 Jet Ranger, tail identifier C-FALQ, and a Robinson R-44, tail identifier CF-NMM.

12   During his dozens of flights, Rosenau flew thousands of pounds of marijuana from

13   Canada into the United States, delivering hockey bags, full of marijuana, to loading sites in

14   Central and Eastern Washington, Idaho and Montana. During some flights the hockey bags were

15   slung by long line below the helicopter; on other flights the hockey bags were strapped to the

16   helicopter skids. A fraction of the marijuana loads smuggled by this group was seized by United

17   States law enforcement, including a 485 pound load on June 9, 2005, a 500 pound load on

18   August 4, 2005 and a 1,100 pound load on September 21, 2005.

19   As Rosenau landed the helicopter at the conclusion of his September 21, 2005 flight,

20   R.C.M.P. officers contacted him. In the helicopter cockpit, Rosenau had a loaded handgun,

21   night vision goggles, two satellite telephones, and a GPS device with known landing sites used

22   by the marijuana traffickers.

23   Rosenau flew several people from Canada into the United States so that they could

24   perform work for the marijuana conspiracy. The workers crossed the border without inspection

25   and stayed in the United States for extended periods of time. They were paid to receive the

26   marijuana deliveries, off-load the bags from the helicopters at remote or rural locations, and

27   drive the marijuana loads to Seattle, Tacoma, and other cities near interstate freeways. Rosenau

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   also assisted by flying some of the workers back into Canada as the need arose. The workers

2   Rosenau flew across the international border include convicted co-conspirators ████████

3 ████████, ████████████, ████████, ████████

4 ████████, ████████████, ████████, and

5 ████████

6        Many of the marijuana loads were brought by the conspirators into the Western District of

7   Washington for distribution. The seized loads were analyzed and confirmed to be marijuana.

8        **8.**    **Sentencing Factors.** The parties agree that the following Sentencing Guidelines

9   provisions apply to this case:

10        a.    A base offense level of at least Level 30, corresponding to at least 945 kg of

11   marijuana that was seized as discussed above, pursuant to USSG § 2D1.1(c), but the parties each

12   reserve the right to argue for or against additional relevant conduct as defined in USSG 1B1.3

13   that, if found by the Court, could result in an increase in the defendant's base offense level; and

14        b.    A two-level reduction for Acceptance of Responsibility, if Defendant fulfills his

15   obligations as set forth in USSG § 3E1.1(a), as outlined below.

16        The parties agree they are free to argue the application of any other provisions of the

17   United States Sentencing Guidelines.   In so doing, the parties are not limited to just the facts

18   included in this Plea Agreement. Defendant understands that at the time of sentencing, the Court

19   is free to reject these stipulated adjustments, and is further free to apply additional downward or

20   upward adjustments in determining Defendant's Sentencing Guidelines range.

21        **9.**    **Non-Prosecution of Additional Offenses.** As part of this Plea Agreement, the

22   United States Attorney's Office for the Western District of Washington agrees  not to prosecute

23   Defendant for any additional offenses known to it as of the time of this Agreement that are based

24   upon evidence in its possession at this time, and that arise out of the conduct giving rise to this

25   investigation. In this regard, Defendant recognizes the United States has agreed not to prosecute

26   all of the criminal charges the evidence establishes were committed by Defendant solely because

27   of the promises made by Defendant in this Agreement. Defendant agrees, however, that for

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  purposes of preparing the Presentence Report, the United States Attorney's Office will provide

2  the United States Probation Office with evidence of all conduct committed by Defendant.

3        Defendant agrees that any charges to be dismissed before or at the time of

4  sentencing were substantially justified in light of the evidence available to the United States,

5  were not vexatious, frivolous or taken in bad faith, and do not provide Defendant with a basis for

6  any future claims under the "Hyde Amendment," Pub.L. No. 105-119 (1997).

7        Defendant agrees to dismiss, and agrees not to file at a later time, any lawsuit(s) in

8  courts in Canada or the United States against law enforcement officers or prosecutors stemming

9  from this case and his extradition.  Defendant agrees such suits are frivolous, and agrees to take

10  all steps necessary and ensure that all such suits that already have been filed are finally dismissed

11  prior to sentencing on this matter.

12        The United States agrees to take no position with regard to any request by

13  Defendant for a treaty transfer made pursuant to a valid treaty with Canada.

14      **10.**    **Acceptance of Responsibility.**  The United States acknowledges that if the

15  defendant qualifies for an acceptance of responsibility adjustment by clearly demonstrating his

16  acceptance of responsibility for his offense, his total offense level should be decreased by two

17  (2) levels, pursuant to USSG § 3E1.1(a).

18      **11.**    **Breach, Waiver, and Post-Plea Conduct.**  The defendant agrees that if he

19  breaches this Plea Agreement, the United States may withdraw from this Plea Agreement and

20  that the defendant may be prosecuted for all offenses for which the United States has evidence.

21  The defendant agrees not to oppose any steps taken by the United States to nullify this Plea

22  Agreement, including the filing of a motion to withdraw from the Plea Agreement.  The

23  defendant also agrees that if he is in breach of this Plea Agreement, the defendant has waived

24  any objection to the re-institution of any charges in the Indictment that were previously

25  dismissed or any additional charges that had not been prosecuted.

26        The defendant further understands that if, after the date of this Agreement, he should

27  engage in illegal conduct, or conduct that is in violation of his conditions of confinement or

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  release (examples of which include, but are not limited to: obstruction of justice, failure to

2  appear for a court proceeding, criminal conduct while pending sentencing, and false statements

3  to law enforcement agents, the Pretrial Services Officer, Probation Officer, or Court), the United

4  States is free under this Agreement to file additional charges against the defendant or to seek a

5  sentence that takes such conduct into consideration by requesting the Court to apply additional

6  adjustments or enhancements in its Sentencing Guidelines calculations in order to increase the

7  applicable advisory Guidelines range, and/or by seeking an upward departure or variance from

8  the calculated advisory Guidelines range.  Under these circumstances, the United States is free to

9  seek such adjustments, enhancements, departures, and/or variances even if otherwise precluded

10  by the terms of the plea agreement.

11      12.     **Waiver of Appeal.** As part of this Plea Agreement and on the condition that the

12  Court imposes a custodial sentence that is within or below the Sentencing Guidelines range (or

13  the statutory mandatory minimum, if greater than the Guidelines range) that is determined by the

14  Court at the time of sentencing, the defendant waives to the full extent of the law:

15      a.     any right conferred by Title 18, United States Code, Section 3742 to appeal the

16          sentence, including any restitution order imposed; and

17      b.     any right to bring a collateral attack against the conviction and sentence, including

18          any restitution order imposed, except as it may relate to the effectiveness of legal

19          representation.

20  Furthermore, this waiver does not preclude the defendant from bringing an appropriate motion

21  pursuant to 28 U.S.C. 2241, to address the conditions of his confinement or the decisions of the

22  Bureau of Prisons regarding the execution of his sentence.

23      If the defendant breaches this Plea Agreement at any time by appealing or collaterally

24  attacking (except as to effectiveness of legal representation) the conviction or sentence in any

25  way, the United States may prosecute him for any counts, including those with mandatory

26  minimum sentences, that were dismissed or not charged pursuant to this Plea Agreement.

27      13.     **Voluntariness of Plea.** The defendant agrees that the defendant has entered into

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  this Plea Agreement freely and voluntarily and that no threats or promises, other than the

2  promises contained in this Plea Agreement, were made to induce him to enter of guilty.

3      **14.**    **Statute of Limitations.** In the event this Agreement is not accepted by the Court

4  for any reason, or if the defendant has breached any of the terms of this Plea Agreement, the

5  statute of limitations shall be deemed to have been tolled from the date of the Plea Agreement to:

6  (1) thirty (30) days following the date of non-acceptance of the Plea Agreement by the Court; or

7  (2) thirty (30) days following the date on which a breach of the Plea Agreement by the defendant

8  is discovered by the United States Attorney's Office.

9      **15.**    **Completeness of Agreement.** The United States and the defendant acknowledge

10 that these terms constitute the entire Plea Agreement between the parties. This Agreement binds

11 only the United States Attorney's Office for the Western District of Washington. It does not

12 bind any other United States Attorney's Office or any other office or agency of the

13 United States, or any state or local prosecutor.

14     Dated this 11ᵗʰ day of July, 2012.

15

16

17     HENRY C. ROSENAU

18     Defendant

    International Transfers
    Transferements Internationaux

19     DEC 0 3 2012

20     CRAIG PLATT

    Attorney for the Defendant

21     File no / dossier_____

22     SARAH Y. VOGEL

    Assistant United States Attorney

23

24     SUSAN M. ROE

25     Assistant United States Attorney

26

27     MARC PEREZ

28     Assistant United States Attorney

PLEA AGREEMENT/ROSENAU
CR06-109MJP - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# EXHIBIT 2

International Transfers
Transferements Internationaux

DEC 0 3 2012

File no / dossier_____

Chief Judge Marsha J. Pechman

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

HENRY C. ROSENAU

                Defendant.

NO. CR06-157 MJP

SENTENCING MEMORANDUM
OF HENRY C. ROSENAU

SENTENCING DATE:
November 7, 2012

Who is Henry Rosenau, what did he do wrong and how on earth did he get to where he is today, scared to death, waiting for this Court to decide his fate and worried that he will one day die in prison before ever seeing the light of day again as a free man?

The answer to the first question is simple, like Henry. He has always been a very simple country man, growing up in the backwoods of remote British Columbia, working hard, providing for his family and helping others in his community whenever the need arose. Until he got involved in this mess he never committed a crime in his life. For the first fifty plus years of life he could best be described as honest as the day is long.

SENTENCING MEMORANDUM: ROSENAU - 1
Case No. CR06-157 MJP

**PLATT & BUESCHER**
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

The second answer is also simple. Henry Rosenau got involved with marijuana smugglers in Canada, and helped them by flying loads of marijuana over the border into the United States.

The third answer is anything but simple. It involves a cast of characters ranging from the smugglers who brought him into their world of crime to the Canadian lawyers and activists who led him astray with their meddling and bad advice.

## A. The Facts

### 1. Who is Henry Rosenau?

Henry Rosenau was born into the sort of fantasy land that many people only dream of. If Norman Rockwell had lived in British Columbia instead of New England, he might have sketched Henry and his young friends, as they played in the woods, swam in the many lakes and rivers, lazed around with their fishing poles in their little boats, and hunted in the mountains.

Henry's father schooled him in the ways of the woods, giving him a gun for his fourteenth birthday to protect him from bears when he was roaming the countryside. The Court has seen photos of this gun. Henry had it with him when he was searched by the RCMP on September 21, 2005. In fact, he went out of his way to draw the gun to the police officers' attention so that they would know to be careful when searching the helicopter he had been flying. He had it to protect himself from bears, a particular fear of his based on his experiences growing up in the wilderness.

Henry attended school at 100 Mile House. It was a sort of an Abe Lincoln experience, as he had to drive for an hour each way every day to school. It wasn't as bad as it could have

SENTENCING MEMORANDUM: ROSENAU - 2
Case No. CR06-157 MJP

**PLATT & BUESCHER**
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

been; his mother drove the school bus so that she could be with her son. Still, Henry's heart was never really in his education. Like so many of his schoolmates he left school after completing 10th Grade, to begin his career as a backwoods trucker and heavy equipment operator. He had had a fascination with big machines since he was a little boy. He wanted to do the sort of work that is now the subject of Reality TV Shows like Ice Road Truckers. For him it was a dream come true.

Henry was also very fond of flying. He was only informally trained to learn how to fly, primarily by his father, and was never qualified as a commercial pilot. In the wilds of British Columbia it was just another way to get around and thereby avoid spending hours on the sometimes treacherous roads. Flying was a way of life for Henry and his dad and he loved it. He never lost his wonder at the beautiful country where he grew up and he particularly enjoyed seeing it from the air. He was a good pilot. Unfortunately.

Henry Rosenau's first job out of high school was working for the mines, driving the giant trucks used to carry materials. When he was eighteen he married his childhood sweetheart, Judy. By the time he was twenty four he had saved up enough money with all of his hard work to buy his own truck to help him with his heavy equipment jobs. Judy gave birth to the couple's only child, Jaclyn, when they were in their early thirties. Both parents were committed to their daughter and by all accounts Henry was an excellent father and husband, working hard and providing for his family while never losing his ability to enjoy life in the woods.

By now Henry was making good money working on roads and projects in the mountains, using the heavy equipment he had been acquiring over the years. Eventually, he

SENTENCING MEMORANDUM: ROSENAU - 3
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

bought a log yard and ran it for the next decade. It wasn't always easy. When the company he was working with was forced into bankruptcy, he sold his equipment in order to pay his employees and outstanding bills out of his own pocket even though he was not made whole by the bankrupt company. The letters submitted with this Memorandum show that this was typical behavior for him. [Exhibit A] It is part of why he was such a valued member of his community, liked and respected by everyone who came into contact with him.

Henry Rosenau then decided to head to the far North of British Columbia where he tried his hand at another exotic rustic pursuit: gold mining. When that did not pan out, he returned home and spent a couple of years clearing land and working on construction projects. Once again, he saved his money and was able to buy a mini storage facility in Okanagan. That did not suit him so he sold it and went back to clearing land and construction projects, once again operating heavy equipment.

Throughout all of these jobs and business projects Henry Rosenau was a dedicated family man, making sure to spend time with his grandchildren and going to great lengths to attend birthdays and holiday celebrations. Unfortunately, the long absences caused by his work led to Judy and Henry Rosenau growing apart, and eventually they separated.

When Henry Rosenau was in his mid fifties, after a full, hard working, law-abiding life he was approached by ██████████ and introduced to the criminal activity that led him to be where he is today. It is important to note that, following his contact with the RCMP on September 21, 2005, Henry Rosenau immediately stopped all involvement with criminals and criminal activity, and went back to working with heavy equipment and once again living a hard working, crime free life. This has included working two jobs at once, helping support his

SENTENCING MEMORANDUM: ROSENAU - 4
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

wife, daughter and also the, Veronica Schwarz, the woman with whom he became involved after he and Judy separated.

During the pendency of this case Henry and Judy Rosenau have reconciled and if he is ever released from prison his plan is to return to Judy Rosenau, with whom he always remained close. However, he has continued to provide for Ms. Schwarz all along, and she continues to live in his residence. Jaclyn and Judy Rosenau still live in the farm that Henry deeded to them shortly after the separation. This is where Henry Rosenau will reside if he is eventually released.

Shortly after Henry Rosenau was taken into custody last Fall his mother died of a massive heart attack. This is one of his greatest regrets and has caused him great emotional distress. His mother's husband is sick with cancer and heart disease.

To this day Henry Rosenau has the love and support of his family and friends, co-workers and community. If he is released he will have employment and support waiting for him. He will not be at risk of re offending, as demonstrated by his conduct and completely crime free behavior following his contact with the RCMP in 2005.

## 2. What Did Henry Rosenau Do?

Henry Rosenau smuggled marijuana out of Canada into the United States. He admits this and accepts full responsibility for his crime. [See Exhibit B]

Henry Rosenau entered a guilty plea in this case on July 11, 2012. His plea was to Count 1 as contained in the Superseding Indictment, that is, to Conspiracy to Import Marijuana, but to a lesser quantity of at least 100 kg of marijuana, in violation of Title 21, United States Code, Sections 952, 960(a)(l) and (b)(2) and 963.

SENTENCING MEMORANDUM: ROSENAU - 5
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

International Transfers
Transferements internationaux

DEC 0 3 2012

Mr. Rosenau admits that he imported marijuana. It was his decision to do that and he has no one to blame but himself. His plea agreement speaks for itself. He ~~was originally~~ ier contacted by ████████, who was a sort of administrative assistant for the main smugglers, who had tasked ██████ to find a pilot who could help them. Henry was offered a chance to make some money smuggling. For the first time in his life Henry Rosenau made the horrendous choice to break the law and participate in the marijuana smuggling. Which is, *first and foremost*, the reason he is where he is today. It is all his fault to be sure. He knows this.

But that is not the entire story.

### 3. How did Henry Rosenau Get to this Point?

This is not the usual tale of a drug interdiction and prosecution. There is more to it than that.

When the Government originally indicted Mr. Rosenau and sought his extradition, he did what anyone in his situation should do. He hired a lawyer. Unfortunately, being a simple man with a tenth grade education, he was at a total loss on how to do this. This is where he was went astray for the second time.

Patrick Roberts, aka Paddy Roberts, aka Ty Roberts, aka Padraig Mac Roibeaird, is a self styled maverick who is committed to intervening in the prosecution of drug cases originating in Canada by U.S. authorities. He leads a splinter political party that advocates the legalization of marijuana and the creation of a separate government for British Columbia, essentially advocating for secession. He first became involved in this matter when he discovered that Mr. Rosenau's case might serve as a platform for venting his ideology. Why and how did that happen?

SENTENCING MEMORANDUM: ROSENAU - 6
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

When the Government sought to extradite Mr. Rosenau they initiated extradition proceedings in Canada. In support of the extradition they filed Record of the Case pleadings for consideration by the Canadian courts. One of these was labeled Supplemental Record of the Case, dated October 6, 2008 and signed by AUSA Roe, the lead prosecutor on this case. [See Exhibit G] This document detailed information allegedly provided to the Government by ███████████. Unfortunately, this document contains false information. Specifically, in this record of the case, Ms. Roe states that in 2004 Mr. Rosenau, working with ████████, flew a helicopter identified as ████████ (id, highlighted portion of text). This was not true. During 2004, as established by the evidence at trial, this helicopter was owned and operated by a mining exploration company, ██████████████████ [See Exhibit D]. Therefore it is factually impossible that it was used by Rosenau for flying marijuana during 2004, as stated in the Supplemental Record of the Case submitted to the Canadian courts.

The reason this is significant is that it made a huge impact on the people in Canada who were following these prosecutions, in particular Roberts. Roberts contacted Henry Rosenau and offered to assist him with his case. In retrospect, it is clear that Roberts was pursuing his own agenda against the U.S. authorities; he felt they were over reaching their legal role in Canada and with this document he had the concrete support he needed to advance his agenda. Mr. Rosenau, with his tenth Grade education, was not exactly sophisticated when it came to international legal proceedings. Roberts offered to assist Mr. Rosenau and his offer was accepted. Ultimately Roberts put Mr. Rosenau in touch with a Mr. Jevning, who assumed Mr. Rosenau's representation.

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

approached the normal path of typical prosecutions and led directly, albeit years later, to Mr. Rosenau's current predicament. This is not to lay blame on anyone for the original mistakes made by Mr. Rosenau. He fully accepts that his participation in the smuggling was his fault. However, what this does explain is how this case wound up heading towards the point of no return.

Roberts told Mr. Rosenau that he was certain he would never be extradited because there was this significant error in the extradition pleadings. Jevning promised the same. Both men assured Mr. Rosenau that if he only did what they told him to do he would never be sent to the United States for prosecution. Not having a clue about how these things work, Mr. Rosenau believed them.

They didn't stop with their assurances about the extradition. They went further, telling Mr. Rosenau when it appeared that he was in fact going to be extradited that the case would be dismissed in the United States under a Rule of Specialty / Abuse of Process analysis. Obviously, they were wrong. Nevertheless, not being a legal expert himself, Mr. Rosenau followed their advice. That was his next big mistake.

According to Mr. Rosenau, Roberts told Mr. Rosenau that when he came to the United States he should never agree to anything he was told by his appointed attorney, should never sign anything, never admit to anyone (including his American lawyer) that he was involved in the smuggling, and above all, never plead guilty. Roberts assured Mr. Rosenau that if he followed this advice everything would eventually be dismissed and he would be back home in no time.

SENTENCING MEMORANDUM: ROSENAU - 8
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

Roberts' position is clear from the various documents he prepared and submitted to Canadian authorities. [See Exhibit E]  In addition, he repeatedly urged Mr. Rosenau's CJA Attorney to personally attack Susan Roe and attempt to have her disbarred.  Counsel, in consultation with Mr. Rosenau, refused to take this path even when Roberts ranted that counsel's refusal to personally attack Ms. Roe constituted incompetence.  He eventually proceeded essentially on his own in this regard.

It is true that Mr. Rosenau believed that if a lawsuit was filed against Roe following his trial that it would improve his legal position.   That is because this is what he had been told by Roberts, someone who obviously knew more about legal procdures than he.  However, he did not want any lawsuit to be filed until after the trial.  Roberts went forward with the suit on his own iniative.   Roberts' approach was described by Mr. Rosenau's appellate extradition attorney, Gary Botting, when he testified at Mr. Rosenau's Detention Hearing one year ago.  [See Exhibit F]  It is clear from the testimony that Roberts habitually exceeds the scope of his authority in these matters.

Why does any of this matter?  This part of the analysis is simple.

It is universally recognized that the federal criminal justice system is a "system of pleas". [See Lafler v. Cooper, 132 S. Ct. 1376, 1388, 182 L. Ed. 2d 398 (2012)]  Defendants have various tools available to them to reduce their punishments, including safety valves, substantial assistance, early pleas and so on.  Everything is negotiated.  Rarely do cases proceed to trial. However, in this case, the minute Mr. Roberts got his hands on the inaccurate Supplemental Record of the Case for Prosecution containing the mistaken reference to C-FRKM being used in smuggling in 2004 when it was not, the writing was on the wall. The erroneous extradition

**PLATT & BUESCHER**
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

pleading became the platform Roberts needed to persuade Mr. Rosenau that he must ignore the common wisdom, refuse to participate in the "system of pleas" and under no circumstances cooperate with the American authorities, including his attorney. To his great detriment Mr. Rosenau followed this advice, thus removing himself and his case from the mainstream that would have offered him opportunities to craft a more acceptable resolution.

In addition to this, when he was offered a possible early resolution by Ms. Roe, prior to his extradition, he was never advised by his then attorney, Mr. Jevning, to seriously consider the plea offer. Furthermore, Mr. Jevning, as a Canadian attorney was not really in a position to offer competent advice on a foreign plea offer. Despite having retained an attorney to provide legal advice Mr. Rosenau essentially received none with respect to the advisability of accepting an early plea offer.

Mr. Rosenau continued to follow the advice he had been given prior to leaving Canada up until the day before he was scheduled to begin his re trial, on July 10, 2012. Faced with the prospect of a second trial and conviction Mr. Rosenau finally realized in a sort of "better late than never" moment of clarity that he needed to "play ball" and admit his guilt. He did so in court the next day. Unfortunately he had not availed himself of the various ways to mitigate the sentence recommendation earlier since he was trying to follow the original advice he had been given, and found himself in an impossible position. Which brings him to where he is today.

**B. The Law**

    **1. 18 U.S.C. Section 3553(a)**

18 U.S.C. Section 3553(a) provides that a sentencing court shall "impose a sentence

SENTENCING MEMORANDUM: ROSENAU - 10
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

sufficient, but not greater than necessary to comply" with certain purposes, including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate deterrence to criminal conduct; (5) the need for the sentence to protect the public from further crimes of the defendant; (6) the need to provide the defendant with educational and vocational training, medical care, or other correctional treatment in the most effective manner; (7) the types of sentences available; (8) the need to provide restitution to victims; and (9) the need to avoid unwarranted sentence disparity among defendants involved in similar conduct who have similar records.

18 U.S.C.§ 3553(a).

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), the guidelines are entitled to no particular deference. They are but one factor to be balanced among many. The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable. Nelson v. United States, 555 U.S. 350, 352, 129 S. Ct. 890, 892, 172 L. Ed. 2d 719 (2009)

The Court should consider the entire circumstances of Mr. Rosenau and of his crime in order to arrive at a fair sentence.

Fairness. If one word can be said to summarize the overriding principle of the entire Anglo-American legal system it is fairness. Like justice, it is a two edged sword. It includes not only fairness to Defendants, but fairness to victims and to others similarly situated. Of course, as admitted by the Government in their Sentencing Memorandum there is no

SENTENCING MEMORANDUM: ROSENAU - 11
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

identifiable victim in this case.

Although fairness and justice are used interchangeably, as in a "just" result being the equivalent of a "fair" result, the fact is that fairness really represents the conscience of the justice system. Henry Rosenau asks that he be given a sentence that is fair, taking into account all of the relevant factors outlined below, knowing that this analysis works both ways.

**2. Sentence Disparity**

Several defendants have been sentenced for their participation in the smuggling activity in which Mr. Rosenau also participated. The related cases described in the Presentence Report prepared by Mr. McNickles in this case illustrate the range of sentences that have been imposed on those individuals who are the most similarly situated to Mr. Rosenau. Five of these individuals received sentences of approximately one year, or less. One, ███████████, received a sentence of 20 months. The final defendant, ███████████ was sentenced to 168 months. The Government describes ███████████ as being roughly equivalent to Mr. Rosenau. This is not the case.

**a.** ███████████

In the Sentencing Memorandum submitted to the court by ███████████ own attorney there is ample information illustrating why his sentence should be substantially greater than Mr. Rosenau's. Mr. Rosenau comes before this Court with zero criminal history prior to this offence. Not so with ███████████

███████████ Sentencing Memorandum provides the following criminal history ████



SENTENCING MEMORANDUM: ROSENAU - 12

Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323



Mr. Rosenau's prior background, with absolutely zero criminal history of any kind, much less prior involvement in major drug crimes, could not be more different. Moreover, Mr. Rosenau's level of involvement in this case is substantially less than that of ███████████ an experienced drug dealer with extensive contacts in the international criminal world. The Government's Sentencing Memorandum filed in that case, prepared by AUSA Roe, amply demonstrates how much more significant ██████████ criminal activities were when compared to Mr. Rosenau's. [See Exhibit H]

To begin with, he was one of the primary organizers and leaders of the marijuana smugglers. In addition to his high level of sophistication, with his extensive criminal background, he was involved for many years in the smuggling, from 2003 until 2006. Unlike Mr. Rosenau, even after being detected he continued to smuggle drugs. Unlike Mr. Rosenau he supervised an extensive network of smugglers. Unlike Mr. Rosenau he lied to his Pre Sentence writer, actively misrepresenting his financial circumstances. When sentenced for his

SENTENCING MEMORANDUM: ROSENAU -
13
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

International Transfers
Transferements Internationaux

DEC 0 3 2012

earlier drug crimes he simply refused to participate in or cooperate with his supervision. His

education is far more extensive than tenth Grade; ███████████████

███████████. Whereas Mr. Rosenau left high school to drive a truck███████████

was President of his Senior Class. They couldn't be more different.

     If Mr. Rosenau were to receive a sentence that exceeded ███████████ given the

latter's extensive involvement in illegal drug activity literally spanning two decades, it would

be beyond disparate. It would be unjust and would certainly not promote respect for the law.

In addition, in contrast to ███████████ with his revolving-door history of criminal activity,

there is absolutely no showing that Mr. Rosenau presents a risk of re offence. Since

September of 2005 he has removed himself entirely from all criminal activity, working long

hours on multiple strenuous jobs and providing for his family. Once he was caught he quit. In

sharp contrast to ███████████, Henry Rosenau did not go right back into the smuggling

business after being detected, did not scoff at his supervision and did not lie to Probation on

his presentence interview. Ms. Roe put it best herself in ███████████ Sentencing Memorandum:

"There are few defendants before the Court who supervised and directed this many

subordinate drug traffickers for so long." [id at 8] Mr. Rosenau's conduct pales in

comparison to ███████████ ongoing, sophisticated and extensive crimes, especially in light

of his supervisory role and power to control the entire operation. Compared to ███████████, Mr.

Rosenau was exactly what he in fact was: a simple man who knew how to fly helicopters and

acted at the direction of those who were far more powerful and sophisticated than he.

     Still, being a pilot meant that Mr. Rosenau was more involved than smugglers like the

███████████. A sentence of five years is more than sufficient to accomplish the goals of

SENTENCING MEMORANDUM: ROSENAU -
14
Case No. CR06-157 MJP

**PLATT & BUESCHER**
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

fairness, promoting respect for the law, assuring deterrence and protecting the public from future criminal activity.   Mr. Rosenau's conduct since 2005 clearly demonstrates that he will never come before a court again if he is ever allowed to return to his family and home in Canada.

Mr. Rosenau's involvement with the smuggling was substantially similar to ▮▮▮ ▮▮▮▮▮▮.   Although he was not a pilot, ▮▮▮▮▮▮ recruited participants, was involved in the planning and execution of smuggling activity, and worked directly with the organizers of the smuggling. ▮▮▮▮▮▮ cooperated and received twenty months. A sentence for Mr. Rosenau of three times that of ▮▮▮▮▮ is more than sufficient to reflect ▮▮▮▮▮▮ position as a cooperator to accomplish the goals of sentencing.

### 3. Medical Issues

Henry Rosenau suffers from diabetes and a thyroid disorder.  In addition, he was diagnosed with Anxiety Disorder while his extradition was pending in Canada.  Medical records confirming this have been provided to Probation for consideration.  Although "sixty may be the new thirty", the fact is that Henry Rosenau is not a well man.  He has not adjusted well to incarceration, has suffered from ongoing mood swings as a result of his thyroid condition, and his anxiety disorder has manifested in weight loss and sleeplessness.  He fears that he will die in prison and never be able to be with his family again.  Although these medical conditions are not life threatening at this point, the medical resources available in prison are at best limited.  In Canada he is eligible for free medical treatment, and would have much more comprehensive medical treatment for his disorders.

SENTENCING MEMORANDUM: ROSENAU -
15
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

To a large extent, these medical problems, combined with his advancing age, make incarceration much more difficult for Mr. Rosenau than it would be for younger men, including Mendoza and Whelpley. It is part of the disparity that should be taken into account when arriving at a fair sentence.

### 4. Attendance at Court Appearances

Mr. Rosenau demonstrated remarkable effort to attend to this case during the time he was released to live in Canada. Ms. Busic indicated that in terms of his adjustment he was a model defendant, notwithstanding the Government's assertions to the contrary. His actions speak for themselves. Once released to return to Canada Mr. Rosenau complied with all requests made of him during his adjustment to pre trial supervision. In addition to regularly driving hundreds of miles in order to meet with Ms. Busic, Mr. Rosenau drove hundreds of miles to attend court on several occasions. He attended two different court dates voluntarily, arriving on time after travelling great distances. In addition, he attempted to try to resolve this case prior to trial by agreeing to attend a Settlement Conference. Unfortunately, the Government did not have his entry paperwork organized so when he arrived at the border on his way to attend the conference he was initially turned away. Nevertheless he waited all day for the paperwork problems to be addressed and participated in an informal meeting at the end of the day that had been set aside for the conference. This willingness to return repeatedly to court, even when he knew that there was a substantial likelihood that he would be taken into custody (which he ultimately was) amply demonstrates Mr. Rosenau's ability to comply with the court's directions and make him an excellent candidate for supervision.

SENTENCING MEMORANDUM: ROSENAU - 16
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

## 5. Appropriate Sentence

The minimum term of imprisonment is five years. The maximum term of imprisonment is 40 years. This offense is a Class B felony. 21 U.S.C. §§ 952, 960(a)(1), (b)(2), and 963.

A sentence of five years is sufficient in this case. Henry Rosenau will be approaching seventy years of age upon completion of this term. Although there is an agreement that the Government will not oppose a Treaty Transfer request, which would allow Mr. Rosenau to return to Canada, it is not clear that he will succeed with such a request.

All of the defendants in this case, with the exception of ███████, have completed their terms of incarceration. The Government makes much of Mr. Rosenau's attempts to cooperate. Ultimately, his decision not to cooperate was based on his fear of retribution, in particular towards his family. As described above, early on in this case Mr. Rosenau was advised to fight extradition because of the mistakes in the extradition Record of the Case submitted to the Canadian courts by the U.S. Attorney's Office. This meant that Mr. Rosenau's case remained unresolved while other cases were settled. Ultimately, his late arrival in the U.S. justice system, after years of contesting extradition as he had been advised to do, meant that he was unable to provide meaningful information for use by the Government. It was simply too old. One can only speculate if those in Canada, especially Mr. Roberts, were intending this outcome. By delaying his extradition case in the Canadian courts the end result was that Mr. Rosenau was precluded from being able to provide useful information and thereby availing himself of the benefits of cooperation. It was simply too late for him to do so, and the Government has essentially conceded this point when making staleness a reason for their reluctance to participate in any cooperation agreement. Once again, the early intervention of

SENTENCING MEMORANDUM: ROSENAU -
17
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

Interna... ... ...afers
Transferencis ... ...ational...

DEC 03 2012

those in Canada who were motivated by the irregularities in the extradition pleadings has

resulted in Mr. Rosenau's case being treated substantially differently than the defendants in

related cases.  Accordingly, he now faces a mandatory minimum sentence of five years, three

times that of the next highest sentence, and five times that of the rest of the related defendants.

It is sufficient.  More than five years would simply be unfair, given the totality of the

circumstances.

### 6.  Sentencing Guidelines

Although the guidelines are advisory only, they are a factor in determining the

appropriate sentence. ·

### a. Base Offense Level

The Base Offense Level in the Plea Agreement of 30 should be applied here.   This

corresponds to the 945 kilograms described in the Plea Agreement.  Mr. Rosenau was not

involved with marijuana delivered on August 12, 2005 and that 'load' should not be added to

the 945 kilograms admitted to in the plea agreement.

### b.  Adjustments

**Acceptance of Responsibility**

Mr. Rosenau should receive a two level reduction for acceptance of responsibility.

[Exhibit B]

### Obstructing

This adjustment is appropriate given the fact that Mr. Rosenau testified at trial.  However,

the Government goes too far with their argument that he repeatedly lied to the court.

With respect to statements made to Julie Busic, there was room for confusion as to which

SENTENCING MEMORANDUM: ROSENAU -
18
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

names on the list Mr. Rosenau recognized. Even the Government states that Mr. Rosenau "worried aloud" about whether he would recognize the names on Ms. Busic's list. The fact is that Mr. Rosenau, not being one of the organizers or supervisors of the smuggling, was just another worker, albeit one with special skill as a pilot. He did not know everyone on the list and was concerned that he would not recognize everyone. That is at best an ambiguous situation. As described at trial, the individuals involved in the smuggling used aliases and nicknames. It was not unreasonable for Mr. Rosenau to express concern that he may not know these people based solely on a list of disembodied names.

With respect to the lawsuits filed, again, this was not an attempt by Mr. Rosenau to misrepresent anything to the Court. When asked during the trial about the lawsuit filed by Roberts, Mr. Rosenau stated quietly, but within earshot of counsel, that the lawsuit against Ms. Roe was supposed to be filed later. Filing a lawsuit based on the erroneous extradition paperwork does not rise to the level of obstructing.

Finally, within a few days of entering his guilty plea Mr. Rosenau signed a dismissal for this lawsuit against the authorities. There was no mention of the lawsuit against ████████ in the Plea Agreement so that is not relevant. In addition, even assuming that this suit was brought to prevent ██████ from testifying against Mr. Rosenau it became moot upon entry of his guilty plea.

**Cooperation**

As described above, a variety of factors, ranging from Mr. Rosenau's fear of retribution to the staleness and limited utility of his information made cooperation impossible in this case. Therefore Mr. Rosenau faces the mandatory minimum sentence of five years, which is

SENTENCING MEMORANDUM: ROSENAU -
19
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

sufficient to punish him, promote respect for the law and deter future criminal activity.

### c. Final Guideline Calculation

Assuming a total base offense level of 34 at most (30 base level, plus two for the firearm, two for being a pilot, two for obstruction, minus two for acceptance of responsibility) the range would be 151-188 months.  However, this results in a sentence that is much more than is necessary to be sufficient punishment for this crime.

### C. Recommendation

Henry Rosenau respectfully submits that a sentence of five years is sufficient punishment.  He has been punished already.  As noted, shortly after he was taken into custody last October his mother died of a heart attack.  His family is suffering without his financial and emotional support, which causes him enormous stress and concern.  His medical problems are not being resolved with the limited resources available to him.  He was naïve when following the direction and advice of Roberts and others and this caused him to place himself in peril legally.

Had Henry Rosenau not followed the advice of his legal counsel in Canada things would be much different.  He could have entered a plea years ago, been sentenced to something comparable to the one year terms imposed in the related cases and would now be home with his family.  Instead, he is now faced with the prospect of dying in prison, never again to be reunited with his loved ones.

The appropriate sentence in this case is five years.  This result will take into account the nature and circumstances of the offense and history and characteristics of Mr. Rosenau, while accomplishing the goals of fair punishment, deterrence, protection of the public, promoting

SENTENCING MEMORANDUM: ROSENAU -
20
Case No. CR06-157 MJP

**PLATT & BUESCHER**
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

respect for the law while reflecting the seriousness of the offense, the need to provide adequate medical care, and, most importantly, the need to avoid unwarranted sentence disparity among defendants involved in similar conduct who have similar records.


DATED this 1st day of November, 2012


                                        Respectfully submitted,
                                        PLATT & BUESCHER

                                        s/Craig Platt
                                        Craig Platt
                                        Attorney for Defendant
                                        WSBA #12396
                                        P.O. Box 727
                                        Coupeville, Washington 98239-0727
                                        Telephone: (360) 678-6777
                                        Fax: (360) 678-0323
                                        Email: craig@plattbuescher.com


SENTENCING MEMORANDUM: ROSENAU -
21
Case No. CR06-157 MJP

PLATT & BUESCHER
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

## CERTIFICATE OF SERVICE

I hereby certify that on 11/01/2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s). I hereby certify that I have served the attorney(s) of record for the defendant(s) that are non CM/ECF participants via telefax.

s/Lisa Klieman
Lisa Klieman
Paralegal
Platt & Buescher, Attorneys at Law
P.O. Box 727
Coupeville, Washington 98239-0727
Telephone: (360) 678-6777
Fax: (360) 678-0323
Email: reception@plattbuescher.com

SENTENCING MEMORANDUM: ROSENAU - 22
Case No. CR06-157 MJP

**PLATT & BUESCHER**
Attorneys at Law
P.O. Box 727
Coupeville, WA 98239-0727
Phone: (360) 678-6777
Fax: (360)678-0323

# EXHIBIT 3

1

Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
2   the Grand Jury and FILED in The U.S.
DISTRICT COURT at Seattle, Washington.

3

MAY 11 2006

4   BRUCE RIFKIN, Clerk

5   By _____ Deputy

6

7

8

9   UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11   UNITED STATES OF AMERICA,            CR06  0157 MJP

12            Plaintiff,                  NO.

13       v.                              INDICTMENT

14   HENRY C. ROSENAU,

15            Defendant.

16                                        06-CR-00157-INDI

17   The Grand Jury charges that:

18                        COUNT 1

19              (Conspiracy to Import Marijuana)

20       Beginning at a time unknown, but within the last five (5) years, and continuing

21   through on or about September 21, 2005, within the Western District of Washington, and

22   elsewhere, HENRY C. ROSENAU did knowingly and intentionally conspire with others,

23   known and unknown, to import into the United States from a place outside thereof,

24   being Canada, marijuana, a substance controlled under Schedule I, Title 21, United

25   States Code, Section 812.

26       The Grand Jury further alleges that this offense involved one hundred (100)

27   kilograms or more of a mixture and substance containing marijuana.

28       All in violation of Title 21, United States Code, Sections 952, 960(a)(1),

INDICTMENT — 1

UNITED STATES ATTORNEY
United States Courthouse
7TH & Stewart
Seattle, Washington 98101
(206) 553-7970

1 | 960(b)(2)(G), and 963.

## COUNT 2

### (Conspiracy to Distribute Marijuana)

Beginning at a time unknown, but within the last five (5) years, and continuing through on or about September 21, 2005, within the Western District of Washington, and elsewhere, HENRY C. ROSENAU did knowingly and intentionally conspire with others, known and unknown, to distribute marijuana, a substance controlled under Schedule I, Title 21, United States Code, Section 812.

It is further alleged that this offense involved (100) kilograms or more of a mixture and substance containing marijuana.

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846.

## COUNT 3

### (Possession of Marijuana With Intent to Distribute)

On or about September 21, 2005, within the Western District of Washington, HENRY C. ROSENAU knowingly and intentionally aided, abetted, induced, and willfully caused the possession with intent to distribute of marijuana, a substance controlled under Schedule I, Title 21, United States Code, Section 812.

It is further alleged that this offense involved (100) kilograms or more of a mixture and substance containing marijuana.

It is further alleged that this offense was committed during and in furtherance of the conspiracy charged in Counts 1 and 2 above.

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

Pursuant to Title 21, United States Code, Section 853, the Grand Jury alleges that, as a result of the felony offenses listed above, punishable by imprisonment for more than one year, the above named defendant shall forfeit to the United States of

INDICTMENT — 2

UNITED STATES ATTORNEY
United States Courthouse
7TH & Stewart
Seattle, Washington 98101
(206) 553-7970

1  America any and all interest in property, real or personal, constituting, or derived

2  from, and proceeds obtained, directly or indirectly, as the result of said criminal

3  offenses, and shall further forfeit any and all interest in property, real or personal, used

4  or intended to be used, in any manner or part to commit, and to facilitate the

5  commission of such felony offenses.  If any of the forfeitable property, as a result of

6  any act or omission of the defendant cannot be located upon the exercise of due

7  diligence, has been transferred or sold to, or deposited with, a third person, has been

8  placed beyond the jurisdiction of the Court, has been substantially diminished in value,

9  ///

10  ///

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT — 3

UNITED STATES ATTORNEY
United States Courthouse
7th & Stewart
Seattle, Washington 98101
(206) 553-7970

1   or has been commingled with other property which cannot be subdivided without

2   difficulty, it is the intent of the United States, pursuant to Title 21, United States Code,

3   Section 853(p), to seek the forfeiture of any property of the defendant, up to the value

4   of the forfeitable properties.

5

6                                              A TRUE BILL

7                                              DATED: May 11, 2006

8

9

10                                             Redacted Pursuant to Judicial Policy

11                                             FOREPERSON

12

13

14   JOHN McKAY
15   UNITED STATES ATTORNEY

16

17

18   DOUGLAS B. WHALLEY
     ASSISTANT UNITED STATES ATTORNEY

19

20

21   RONALD J. FRIEDMAN
     ASSISTANT UNITED STATES ATTORNEY
22

23

24   SUSAN M. ROE
25   ASSISTANT UNITED STATES ATTORNEY

26

27

28

INDICTMENT — 4

UNITED STATES ATTORNEY
United States Courthouse
7th & Stewart
Seattle, Washington 98101
(206) 553-7970

Form 2
Section 15 - Authority to Proceed

TO: The Attorney General of Canada

In the matter of an extradition request pursuant to the provisions of the *Extradition Act*,
S.C. 1999, c.18

## SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

### THE ATTORNEY GENERAL OF CANADA
### (on behalf of the UNITED STATES OF AMERICA)

- and -

### HENRY C. ROSENAU

### AUTHORITY TO PROCEED
### (Section 15 *Extradition Act*)

This is Exhibit " A " referred to in the
affidavit of.... *DENNIS PIRLY*....
Sworn before me at.... *VANCOUVER*....
in the Province of British Columbia this
*15* day of.... *JUNE*........20 *07*.
...............................................
A Commissioner for taking Affidavits
within British Columbia

The Minister of Justice authorizes the Attorney General of Canada to proceed
before the Supreme Court of British Columbia to seek an order for the committal
of Henry C. Rosenau who is being sought for prosecution by the United States of
America. The Canadian offences which correspond to the alleged conduct are:

- Trafficking in cannabis (marijuana) contrary to section 5(1)
  of the *Controlled Drugs and Substances Act*;

- Possession of cannabis (marijuana) for the purpose of
  trafficking contrary to section 5(2) of the *Controlled Drugs
  and Substances Act*;.

2

- Conspiracy to traffic in cannabis (marijuana) contrary to section 5(1) of the *Controlled Drugs and Substances Act* and section 465 (1) of the *Criminal Code*.

DATED at Ottawa, Ontario this 16th day of April, 2007.

Raphael Ali Jean-Pierre, Counsel
International Assistance Group
for the Minister of Justice of Canada

8  ~~certify that the evidence summarized or contained in the attached document is available~~
9  for trial and is sufficient under the laws of the United States to justify prosecution.

10
11  *April 9, 2007*                          *Douglas B Whalley*
    **Date**                                 **DOUGLAS B. WHALLEY**
12                                           **Assistant United States Attorney**
                                             **Western District of Washington**
13

14

15

16

17

18                          This is Exhibit " B  "referred to in the
19                          affidavit of ...... Dennis Firr ..............
                            Sworn before me at ... VANCOUVER ......
20                          in the Province of British Columbia this
21                          ..13 day of ......... JUNE ............... 20 07 ..
22                          ..................................................
                            A Commissioner for taking Affidavits
23                              within British Columbia

24

25

26

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# EXHIBIT 4

## Certification of Record of the Case for Prosecution

In the Matter of a Request by the United States for the Extradition of
Henry C. Rosenau from Canada for prosecution.

The United States requests the extradition of Henry C. Rosenau from Canada for

prosecution.

In relation to that request, I, Douglas B. Whalley, Assistant United States Attorney,

certify that the evidence summarized or contained in the attached document is available

for trial and is sufficient under the laws of the United States to justify prosecution.

april 9, 2007

Date

DOUGLAS B. WHALLEY
Assistant United States Attorney
Western District of Washington

This is Exhibit " B " referred to in the
affidavit of ......Dennis Pike........
Sworn before me at ....Vancouver.......
in the Province of British Columbia this
..18..day of .....July............20 17.

A Commissioner for taking Affidavits
within British Columbia

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970.

## RECORD OF THE CASE FOR PROSECUTION

1.    Royal Canadian Mounted Police (RCMP) Constables Kim Bloy and Luc Quenneville are expected to testify that on September 21, 2005, at 7:30 a.m., they were two to three miles north of the Canada - United States border, in the Ashnola River Valley. They both observed a Robinson R-44 helicopter, tail number C-FBKM, flying north, without an apparent cargo. (As discussed later, the tail number was partially covered with tape. The real number was C-FRKM, but the tape made the R appear to be a B). The Constables will further testify that at 8:00 a.m. on the same day, they saw the helicopter flying southbound towards the United States with hockey bags attached via a long line underneath the helicopter. At 8:59 a.m., they saw the same helicopter flying northbound, without the hockey-bags underneath it. At 9:00 a.m., they observed it flying southbound, this time a short line with hockey bags was attached underneath it. They identified it each time by the tail number.

2.    United States Immigration and Customs Enforcement (ICE) Special Agent Kevin Martin, Blaine, Washington, is expected to testify that on September 21, 2005, at 9:45 a.m., he observed a Robinson R-44 helicopter[1] fly out of the Lamb Butte area of Washington State, in the Pasayten Wilderness Area, Okanogan National Forest, just across the border from the Ashnola River Valley of British Columbia. Agent Martin will testify he was positioned at the 8-Mile Road Snow Park on Forest Service Road 51, in the Okanogan National Forest, when he observed the helicopter fly east, then north, and then west, before he lost visual contact with the helicopter. Agent Martin will testify that he thereafter observed two vehicles departing the 8-Mile Road area. This road comes from the Lamb Butte area where the helicopter landed. Agent Martin will further testify that he followed the vehicles (later determined to be occupied by Zachary Miraback and Braydon Miraback) to Puyallup, Washington, near Seattle. He then turned over surveillance to Special Agent Steve Cagen.

3.    ICE Special Agent Steve Cagen is expected to testify that he took over surveillance from Agent Martin and followed the two vehicles occupied by Zachary Miraback and Braydon Miraback until they were stopped and arrested in Puyallup, Washington. He and other agents seized 1,128 pounds of suspected marijuana from their vehicles.

---

[1] Special Agent Martin will testify that because of his distance from the helicopter, he never saw the tail number, just the color and make of the helicopter. He later determined that it was the same helicopter (tail number C-FRKM) based on Zachary Miraback's identification from a photograph of the helicopter that HENRY RC SENAU flew.

Record of the Case/Rosenau – 1

4.   ICE Special Agent Mark E. Albedyll is expected to testify that he submitted 11 representative samples of the marijuana seized from Zachary Miraback and Braydon Miraback to the United States Drug Enforcement Administration (DEA) Laboratory in San Francisco, California, for analysis.

5.   John S. Chappel will testify that he is employed at the DEA Western Laboratory in San Francisco. He is a criminalist and forensic chemist, and is trained to identify marijuana. He will testify that he examined 11 samples of the marijuana that was seized on September 21, 2005, by Agent Albedyll and others, identified by the Case Number, SE13MR05E:L0088, the Seizure No. 2005SA002415301, the agent's name "Mark E. Albedyll," the date of seizure, the seizure location "Puyallup, Washington," the file name "Zachary M rabach"(sic), and a reference to "Two subjects were arrested who transported the marijuana from the Canadian border . . ." He identified the contents as marijuana. He will testify that it is also known as cannabis. Criminalist Chappel's two-page report is attached as Exhibit B.

6.   Special Agent Cagen will further testify that Zachary Miraback cooperated with the agents after his arrest, and Zachary Miraback identified a photograph of HENRY C. ROSENAU (a copy of which is attached as Exhibit A) as the pilot of the helicopter that smuggled the marijuana into the United States seized by the agents. Zachary Miraback told Special Agent Cagen (and is expected to testify) that ROSENAU had dropped marijuana several different times to him and his brother, Braydon Miraback. Special Agent Cagen will further testify that Braydon Miraback also cooperated, and he also identified the photograph of HENRY C. ROSENAU (a copy of which is attached as Exhibit A) as the pilot of the delivery helicopter for four different loads of marijuana he helped smuggled into the United States. Both Zachary and Braydon Miraback also identified a photograph of the helicopter, tail number C-FRKM, that was used in all four loads.

7.   Zachary and Braydon Miraback are both expected to testify to the following: They have cooperated completely with ICE agents following their arrest, and they have provided full statements relating to their involvement with the marijuana seized from their vehicles on September 21, 2005. Based on these statements, they are expected to testify to the following matters: They both know HENRY C. ROSENAU personally and can identify his picture (Exhibit A) because they met with him several times in Canada to plan marijuana-smuggling trips to the United States from Canada, using a helicopter. They both saw him during those trips operating the helicopter. Zachary Miraback will testify that on one occasion he accompanied ROSENAU when ROSENAU flew into the United States with a load of marijuana. Both Zachary and Brandon will further testify that they met with ROSENAU in Canada shortly before September 21,

Record of the Case/Rosenau – 2

2005, and that they discussed with ROSENAU that he would be operating the helicopter which would transport marijuana from Canada to the United States. Zachary and Brandon agreed that they would be meeting the helicopter operated by ROSENAU and would be transporting the marijuana to Seattle. They will testify both that on September 21, 2005, they were together in the vicinity of the 8-Mile Road area of Forest Service Road 51, in the Pasayten Wilderness Area of Okanogan National Forest, in northern Washington State, close to the Canadian border. Birgis Brooks met them later and was participating in their smuggling plan. A helicopter flew to that location four times and delivered marijuana. They knew that the pilot of the helicopter was HENRY C. ROSENAU and they knew it contained marijuana from Canada because that was the plan they had agreed to with ROSENAU, because they saw ROSENAU operating the helicopter, and because they took possession of the marijuana after ROSENAU delivered it. Both Zachary Miraback and Brandon Miraback will testify that after the fourth load of marijuana was delivered by ROSENAU, they loaded the marijuana into a white van, and drove towards Seattle. When they arrived in Seattle, ICE agents stopped them and seized a total of 1,128 pounds of marihuana from the van. They will testify that the marijuana seized from the van was the same marijuana which had been delivered by helicopter by HENRY C. ROSENAU earlier on September 21, 2005, that it had been in their possession since when they received it from ROSENAU, and that it had been smuggled into the United States from Canada by ROSENAU. Both Braydon and Zachary Miraback will testify that they identified a photograph of the helicopter that HENRY C. ROSENAU was operating on September 21, 2005. They were able to identify it because they saw it on September 21, 2005, as planned, and had seen it in earlier smuggling trips made by ROSENAU. Both will testify that they were shown more than one picture of a helicopter when they identified the one used by ROSENAU, and that they were shown a series of photographs of males when they identified ROSENAU'S photograph. They will testify they were not told which picture was of ROSENAU.

8.    RCMP Corporal Ken Kachur and Corporal Rick Poulson are expected to testify that on September 21, 2005, at 11:10 a.m., they observed helicopter C-FRKM flying towards a landing area known as the "Shop," in Yale, British Columbia, Canada. HENRY C. ROSENAU, wearing a purple shirt, was flying the helicopter. At 11:15 a.m., Cpl. Kachur and Cpl. Poulson approached the helicopter, C-FRKM, and observed HENRY C. ROSENAU walking away from the helicopter, which still had its rotors turning. Corporal Kachur identified himself as a police officer to ROSENAU and ROSENAU provided a British Columbia driver's license in the name of ROSENAU, Henry Carl, with a date of birth of December 24, 1950, an address of 4767 Grandview Flats, Armstrong, British Columbia, and with driver's license number 1343350.

Record of the Case/Rosenau – 3

9.  Corporal Kachur will further testify that he advised ROSENAU that he was being detained for investigation into marijuana exportation and advised him of his rights. ROSENAU said that he was flying the helicopter during the day around Hope, British Columbia. ROSENAU advised Cpl. Kachur that the gym bags in the helicopter were his. Corporal Kachur asked ROSENAU if there was anything illegal in the helicopter and ROSENAU said that there was a loaded handgun under the front seat of the helicopter. For officer safety, Corporal Kachur located and detained the loaded .44 magnum handgun from inside the helicopter, and made the gun safe. Corporal Kachur looked into ROSENAU'S gym bags and located night vision goggles, a Global Positioning Satellite (GPS) device, and two satellite phones. The GPS device had latitude/longitude coordinates for the Shop, as well as coordinates for two landing zones located just north of the Canada/U.S. Border. Those landing zones have been identified by RCMP authorities as areas commonly used to load contraband onto helicopters for trips to the United States. There were two GPS coordinates on the border. One of the coordinates was titled "Entrance." There were several GPS locations just south of the Canada/U.S. Border. One of those locations was the landing zone in the Lamb Butte area.

10.  Corporal Kachur will further testify that he also observed that the tail numbers on the R-44 Helicopter, C-FRKM, were covered with white duct tape covering the R, to make it look like a B. With the tape on the number, it would appear that the tail number was "C-FBKM" instead of the actual number of C-FRKM.

11.  Corporal Kachur will further testify that he spoke with another male who came onto the property and was identified as the property owner. He was Glen Gordon Stewart, with a date of birth of September 13, 1941, an address of 21386 Lakeview Crescent, Hope, B.C. Stewart said that he owned the property where the helicopter was stored, at 29605 Highway 1 N., Yale, B.C. Stewart said that he was selling the property to ROSENAU but that the deal fell through the previous week. Stewart said that he owned the shed on the property and that he let ROSENAU use it to store his helicopter. ROSENAU also stated to Cpl. Kachur that the shed belonged to Stewart. Stewart gave Cpl. Kachur permission to look inside the shed. Stewart further said that ROSENAU flew quite frequently and that he had observed him pilot the helicopter. Stewart said he had just observed ROSENAU landing the helicopter as he arrived onto the property. Stewart also said that he had seen ROSENAU and other persons at the shed on prior occasions.

12.  Corporal Kachur will further testify that inside the shed was a red Jeep Cherokee bearing British Columbia license plate HSK-744, which is registered to ROSENAU, and a trailer with a cargo net and several barrels believed to have fuel in them. Two large gas tanks were on the trailer. The trailer is commonly used to refuel a

Record of the Case/Rosenau – 4

helicopter in rural areas. ROSENAU then stated that the shed was not his but that he used it. Corporal Kachur concluded his contact with ROSENAU and left the area.

13.     Corporal Kachur will further testify that at 1:00 p.m., the helicopter (C-FRKM) and ROSENAU were observed at ROSENAU'S residence, located at 4667 North Grandview Flats, Armstrong, British Columbia.

14.     Corporal Kachur will further testify that he took the photograph attached as Exhibit A, and it is a photograph of Henry C. ROSENAU.

*Challenge?*

## Summary of the Physical Evidence

15.     The following items of physical evidence, among others, are expected to be introduced at trial:

a.     Photographs of the marijuana seized on September 21, 2005;

b.     Laboratory report from the analysis of the marijuana samples, completed on October 27, 2005;

c.     Photographs of helicopter C-FRKM with a sling load of marijuana, taken on September 21, 2005;

d.     Photograph of the taped-over tail number on helicopter C-FRKM, taken on September 21, 2005;

e.     Photograph of the gun found in helicopter C-FRKM, taken on September 21, 2005; and

f.     Photograph of HENRY C. ROSENAU, which co-conspirators identified as ROSENAU. A copy of that photograph is attached as Exhibit A.

## Description and Identifiers

16.     Henry C. Rosenau, a Canadian citizen, currently resides at 4767 Grandview Flats, Armstrong, British Columbia. Based on the driver's license information

Record of the Case/Rosenau – 5

provided by Corporal Kachur, Rosenau's date of birth is December 24, 1950. His driver's license number is 1343350.

April 9, 2007
Date

DOUGLAS B. WHALLEY
Assistant United States Attorney
Western District of Washington

Record of the Case/Rosenau – 6

# HENRY C. ROSENAU

## Record of the Case

## EXHIBIT A

## Photograph of Henry C. Rosenau



# Henry C. Rosenau

# EXHIBIT B

# Laboratory Report

U.S. Department of Justice
Drug Enforcement Administration

REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

U53644

7/30/92

| 1. OBTAINED (Check) | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|---|
| ☐ Purchase ☒ Seizure ☐ Free Sample | | | SE13MR05HL008B | | |
| ☐ Lab. Seizure ☐ Money Flashed ☐ Compliance Sample (Non-Criminal) | | | 2005SA002415301 | | |
| ☐ Internal Body Carry ☒ Other (Specify) Lab Sample | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Puyallup, Washington | 9/21/2005 | MIRABACH, Zachary |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| US Immigration and Customs Enforcement | ☐ Case No. OR ☐ Seizure No. See 2a. | 09/26/2005 | |

| 9. Exhibit No. | 10. FORM (if charged) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| A | 2005143412 | Marijuana | Approx. 1 kilo | 514 kg | 4.7pp kg | |
| B-1K | 2005143412 | Marijuana | 10 - 5 gram packages | 514 kg | Not Phytochemically 1336.2 g | |

16. IS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG? ☒ NO (indicated above) ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On September 21, 2005, US Immigration and Customs Enforcement Seattle Special Agents conducted a probable cause search of a vehicle and seized approximately 1200 pounds of Marijuana in Puyallup, Washington. Two subjects were arrested who had transported the marijuana from the Canadian Border in Puyallup, Washington.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Mark E. Abedyll | Anne L. Haronen |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 2 PIECE | 8481 0912 9/9/? 9/9/05 | FnCo |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) 9/30/05 | 24. Print or Type NAME and TITLE Kate Waffle FC |

**LABORATORY REPORT**

ANALYSIS SUMMARY AND REMARKS

See Laboratory Report

| 25. Exhibit No. | 27. Lab No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF SUBSTANCE | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| John J. Chappell | Forensic Chemist | 10/27/2005 |
| 37. APPROVED BY (Signature & Date) Donald Chim 10/18/05 | 38. TITLE Laboratory Director | 39. LAB. LOCATION San Francisco, CA |

DEA Form - 7 (Sept. 1998)   Previous edition dated 8/90 may be used until stock is exhausted.   1 - Prosecution

## SUPPLEMENTAL RECORD OF THE CASE FOR PROSECUTION

1.      This supplemental Record supplements the Record of the Case for Prosecution (the "original Record"), dated April 9, 2007, submitted as part of the United States' request for the extradition of Henry C. Rosenau from Canada.

2.      There is an additional witness who was not available at the time the original Record was submitted. Kip John Whelpley came voluntarily to the United States, entered a guilty plea to conspiracy to import and distribute marijuana, and has cooperated fully with agents from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), since his arrival in the United States. Whelpley is expected to testify to the following:

a.      Whelpley came to United States in the spring of 2004 to assist with smuggling marijuana from Canada into the United States. He first looked for helicopter landing spots in unpopulated and rural areas south of the United States-Canada border. With the assistance of another person, he purchased a truck and canopy cover which he used to receive and transport shipments of marijuana in the United States.  In the summer of 2004, Whelpley received approximately seven loads of marijuana in the United States. Each load was brought across the international border by helicopter from Canada. Specifically, Whelpley saw a Robinson 44 helicopter, with a missing or taped-over tail number, which was used to smuggle the marijuana that summer. Whelpley identified the picture of that helicopter, tail number C-FRKM, which was referred to in the original Record. Each load consisted of 10 to 12 hockey bags which he estimated contained approximately 50 pounds each for a full load of approximately 500 to 600 pounds of marijuana. He was paid $7,000 per load and, that summer, he made $50,000 to $60,000 smuggling marijuana in this fashion before the smuggling season ended.

b.      In early 2005, Whelpley resumed his role in marijuana smuggling after meeting Henry Rosenau in Canada. During the meeting Henry Rosenau discussed the 2004 trips, acknowledged he was the pilot of the helicopter, referred to above, during the 2004 trips, and confirmed their prior contacts by his knowledge of Whelpley's Blackberry name ("Gilligan") and recalling their previous discussions, including one where they had discussed the details of a smuggling trip which was cancelled because of fog. Henry Rosenau also told Whelpley that he maintained Whelpley's cash payments in his safe during the prior summer. Whelpley visited Henry Rosenau at his residence at 4767 Grandview Flats, Armstrong, British Columbia, Canada.

c.      In spring 2005, Whelpley returned to the United States with Henry Rosenau. Together, they scouted areas in Washington State for landing zones for Henry Rosenau's helicopter. Whelpley rented a small home in Washington State for the summer and began receiving loads of marijuana. Henry Rosenau brought a few marijuana loads in a second, smaller helicopter, a Robinson 22; however, that smaller helicopter could carry only 200 pounds at a time. Henry Rosenau began flying another larger, red Bell helicopter by late spring and brought marijuana loads of approximately 500 pounds at a time. Whelpley estimates that he received twenty 500 pound marijuana loads from Henry Rosenau that summer, including one week in which he received three 500 pound loads in five days. Whelpley said that Henry Rosenau was the pilot of every helicopter load, either flying alone or with one other person.

84
Exhibit 3

Whelpley was stopped by ICE agents on June 9, 2005, with a 500 pound marijuana load he had just received from Henry Rosenau.

    d.    Whelpley identified the person depicted in the photograph attached as Exhibit A as Henry Rosenau.

3.    Referring to paragraph 7 of the original Record, Zachary and Braydon Miraback are no longer expected to testify.

Seattle, Washington
October 7, 2008

SUSAN M. ROE
Assistant United States Attorney
Western District of Washington

2

# EXHIBIT 5

34
Requesting State's Book of Documents - Volume II
March 2, 2009
Tab 4

Certification of Second Supplemental Record of the Case for Prosecution

**In the Matter of the request by the United States for the extradition of Henry C. Rosenau from Canada for prosecution.**

The United States requests the extradition of Henry C. Rosenau from Canada for prosecution.

In relation to that request, I, Susan M. Roe, Assistant United States Attorney for the Western District of Washington, certify that the evidence summarized or contained in the attached documents is available for trial and is sufficient under the laws of the United States to justify prosecution.

Seattle, Washington
February 5th, 2009

SUSAN M. ROE
Assistant United States Attorney
Western District of Washington

## SECOND SUPPLEMENTAL RECORD OF THE CASE FOR PROSECUTION

1.      This supplemental Record supplements the Record of the Case for
Prosecution (the "original Record"), dated April 9, 2007, and the first Supplemental
Record of the Case, dated October 7, 2008, submitted as part of the United States' request
for the extradition of Henry C. Rosenau from Cañada.

2.      In reference to paragraph 2 of the first Supplemental Record, Immigration
and Customs Enforcement (ICE) Special Agent Chad Boucher is expected to testify to the
following: on June 9, 2005, agents from ICE, U.S. Forest Service, and Customs and
Border Protection (CBP) Air and Marine initiated a surveillance operation in the
Okanogan National Forest at a location near where Kip John Whelpley had been observed
earlier by Officer Graves.

3       CBP Pilot Mike Corcoran is expected to testify that he participated in the
operation in a surveillance aircraft as an aircraft crew member. At approximately 4:35
a.m. on June 9, 2005, he observed a truck traveling westbound on Forest Road 5140,
north of Winthrop, Washington. The truck stopped at a clearing on a spur road off of
Road 5140, identified as Forest Service Road 280. (The vehicle was later determined by
Special Agent Boucher to be Whelpley's blue Ford F150 vehicle, with Washington plates,
no. A09099W.) The F-150 vehicle had a large camper shell on the back of it.

4.      CBP Pilot Eric Hausner is expected to testify that he also participated in the
operation in a surveillance aircraft on June 9, 2005. At approximately 4:53 a.m., he
observed an aircraft flying in a southeast direction approximately three miles from the
United States/Canadian border. He observed that the aircraft was a Bell Jet Ranger
helicopter and was flying at an elevation just above the treetops. He confirmed that no
aircraft had reported foreign arrival into the United States on the morning of June 9, 2005,
at the nearby Oroville, Washington Port of Entry. CBP Pilot Hausner continued to track
the helicopter until it arrived at a clearing on Forest Service Road 280.

5.      CBP Pilot Mike Corcoran will further testify that at approximately 4:56
a.m. on June 9, 2005, he observed a helicopter land at the clearing on Forest Service Road
280, near the Ford F-150 vehicle. He observed that the helicopter was a Bell Jet Ranger
and was white in color with a red stripe. He observed large bags strapped to each skid of
the helicopter. When the helicopter landed he saw the pilot exit, and unload the bags. He
observed a man (later identified as Kip John Whelpley) approach the helicopter, and help
the pilot unload the large bags from the skids. The pilot and Whelpley also unloaded
several other bags that were located inside of the helicopter. Both the pilot and Whelpley
carried the bags to the rear of Whelpley's Ford F-150 vehicle. CBP Pilot Corcoran

6

.equesting State's Book of Documents - Volume II
1arch 2, 2009
ab 4

observed several bags being placed inside the rear of the camper shell on Whelpley's vehicle. At approximately 5:01 a.m., he observed the pilot get back into the helicopter and take-off from the clearing. At approximately 5:05 a.m. CBP Pilot Corcoran observed Whelpley's Ford F-150 vehicle depart the clearing and proceed down Forest Service Road 5140. He observed Whelpley's vehicle travel to the intersection of Forest Service Road 5140 and West Chewuch Road, where the driver of Whelpley's vehicle met with the driver of a Dodge Durango vehicle. (The Dodge Durango vehicle was later observed by Special Agent Boucher to have no affixed license plates and a paper, possibly a temporary license, in the rear window). CBP Pilot Corcoran observed the Ford F-150 vehicle and the Dodge Durango vehicle, now driving in tandem, travel to the Boulder Creek Campground, before traveling to the Chevron Service Station in Pateros, Washington. Equipment in CBP Pilot Corcoran's aircraft videotaped the Chevron gas station meeting involving the occupants of the F-150 truck and the Dodge Durango vehicle.

6.     CBP Pilot Ernest Szuminshi will testify that he participated in the operation in a

surveillance aircraft, and that he tracked the helicopter as it left the clearing where it was observed by CBP Pilot Corcoran. He will testify that the helicopter flew northbound across the United States/Canadian border and into Canada, where he lost visual sight because of bad weather.

7.     ICE Special Agent Chad Boucher is expected to testify that at approximately 6:35

a.m. on June 9, 2005, he observed Whelpley's Ford F-150 truck and a Dodge Durango vehicle parked at the Chevron Service Station in Pateros, Washington. He communicated with other agents, and confirmed that the Ford F-150 truck had been followed from the site of the helicopter marijuana delivery. He observed Whelpley and an unidentified passenger exit the F-150 truck and enter the Chevron Service Station. Shortly thereafter, he observed that the drivers of the F-150 truck and the Dodge Durango vehicle leaving the Chevron station. He will testify that he reviewed a CBP air surveillance videotape of the incident, and it revealed that only Whelpley got into the F-150 truck, not the passenger who exited the truck earlier. He observed both vehicles being driven in tandem southbound on Highway 9.

8.     Special Agent Boucher will further testify that at approximately 9:10 a.m. on June 9, 2005, he observed Whelpley in the F-150 vehicle and the unidentified man in the Dodge Durango vehicle drive their vehicles to Interstate 90, and proceeded westbound. Approximately two miles later, under the border search authority of ICE, Washington State Patrol Trooper David Anderson initiated a traffic stop of Whelpley's Ford F-150 truck. Special Agent Boucher will testify that the F-150 truck had been under

2

7
equesting State's Book of Documents - Volume II
arch 2, 2009
ab 4

constant surveillance by ICE and CBP agents from the time the bags from the helicopter
were transferred to the truck until the traffic stop.

9.      Washington State Patrol (WSP) Trooper David Anderson will testify that he
stopped the Ford F-150 truck driven by Whelpley. Trooper Anderson asked Whelpley for
his drivers license and registration for his vehicle. Whelpley presented his Washington
State drivers license, and started looking through his vehicle for his registration.
Whelpley found the registration to the truck, however he stated that he did not know
where the registration to the camper was located. Trooper Anderson then informed
Whelpley that the camper registration was located on the paper license that was located in
the rear window of the camper on his vehicle. He then asked Whelpley to get the
registration out of the camper. Whelpley stated that he would rather not. Trooper
Anderson again asked him to get his registration and Whelpley stated "I fail to see how
I'm going to be in any less trouble by allowing you to see what is inside." At that time
Whelpley was placed in handcuffs and placed in the back seat of the Trooper's car.
Whelpley and the Ford F-150 truck were then transported to the nearest WSP office.
Whelpley was later released to avoid revealing the ongoing investigation. He was not
fingerprinted.

10.     ICE Special Agents Boucher and Kevin Martin, WSP Trooper Anderson,
WSP Trooper Paul Woodside, and United States Forest Service Special Agent Minden
will all testify that they conducted a search of Whelpley's Ford F-150 vehicle at the WSP
District Office. They acted under the authority of federal agents to conduct a search for
smuggled contraband entering the United States, when the vehicle searched has been
followed from the border, or from an area where smuggled items could be loaded.
During the search, 11 large black hockey style bags containing approximately 486 pounds
of marijuana were discovered in the camper of Whelpley's vehicle. Special Agent
Boucher will testify that he took representative samples of the marijuana seized from
Whelpley's vehicle and submitted them to the Drug Enforcement Administration (DEA)
Western Laboratory in San Francisco.

11.     Special Agent Boucher will further testify that, while conducting a follow-
up investigation of Whelpley and the Dodge Durango vehicle, he reviewed Washington
State vehicle registration records. Those records revealed that "Kip Whelpley" was the
registered owner of a silver, 1998 Dodge Durango, Washington license 384TTR,
registered to an address of 43 Twisp Airport Road, Twisp, Washington 98856. He will
also testify that in June 2005, Whelpley had a parking permit for a Dodge Durango
vehicle, Washington license 384TTR, at the Harbor Steps Apartments parking garage, on
Western Avenue, Seattle, Washington. Special Agent Boucher will further testify that
records for that license number led him to a car dealership. On October 4, 2005, he

3

State's Book of Documents - Volume II
609

interviewed Mike Kaiser ("Kaiser"), the owner of Choice Auto and Truck in Omak, Washington. Kaiser stated that, on May 16, 2005, Whelpley purchased a silver 1998 Dodge Durango vehicle from Choice Auto for $9,661.55. Kaiser said that the same Dodge vehicle was later resold to Choice Auto by a man named Jonathan Senecal on August 24, 2005. Senecal's driver's license was from Ontario, Canada. Senecal told Kaiser that he had bought the car from Kip John Whelpley. Special Agent Boucher will testify that he viewed a picture of the Dodge Durango vehicle that was sold to Whelpley, and then resold back to Choice Auto, and noticed that the Durango was the same color as the one that he observed on June 9, 2005. He was told by Kaiser that Choice Auto puts an advertisement in the license plate holder when the vehicle has no license. The ad has a bright yellow border and red letters saying "CHOICE."

12.    Paul Eyerly will testify that he is employed at the DEA Western Laboratory in San Francisco. He is a criminalist and forensic chemist, and is trained to identify marijuana. He will testify that he examined representative samples of the packages of marijuana that were seized on June 9, 2005, by Agent Boucher and others, identified by the Case Number, BL13MR05BL0079, and the Seizure No. 2005300400016101, and the name "Kip John Whelpley." He will testify that he identified the representative samples taken from the seizure, weighing approximately 480 grams, as marijuana which is also known as cannabis.

_February 5 2009_
DATE

_Susan M. Roe_
SUSAN M. ROE
Assistant United States Attorney

4

# EXHIBIT 6



**U.S. Department of Justice**

Criminal Division
Office of Enforcement Operations
International Prisoner Transfer Unit

_Washington, D.C. 20530_

JUN 26 2013

Chris Hill, Director
Institutional Reintegration Operations
Correctional Service of Canada
340 Laurier Avenue West
Ottawa, Ontario K1A 0P9
Canada

      Re:    Henry Carl Rosenau, Reg. No. 41168-086
             aka: Henry C Rosenau
             Denial of Request to Transfer to Canada

Dear Mr. Hill:

      After considering all of the appropriate factors in this transfer application, the United States has denied the request to transfer to Canada. The prisoner is currently incarcerated at the Northeast Ohio Correctional Center, Youngstown, Ohio. The United States denied the transfer application because of serious law enforcement concerns.

      There is no administrative appeal from this decision. The prisoner may reapply two years from the date of this letter, at which time, the United States will review the information already available, as well as any new information that the prisoner provides. If the prisoner believes that the circumstances relating to the denial of the transfer application have changed significantly, the prisoner may write to the Department of Justice to seek a reconsideration of the transfer decision earlier than two years from the date of this letter. Unless the prisoner is able to show that the reasons supporting the denial of his transfer application have changed substantially, it is unlikely that the United States will change its decision.

                         Sincerely,

                         Paula A. Wolff, Chief
                         International Prisoner Transfer Unit

cc:     Hélène Bouchard, Embassy of Canada, Washington, D.C.
        Michael Harris, Federal Bureau of Prisons, Washington, D.C.
        Henry C Rosenau

# EXHIBIT 7



**U.S. Department of Justice**

Criminal Division
Office of Enforcement Operations
International Prisoner Transfer Unit

---

*Washington, D.C. 20530*

SEP 0 9 2013

Henry Carl Rosenau
Reg No. 41168-086
Northeast Ohio Correctional Center
2240 Hubbard Road
Youngtown, Ohio 44505

Dear Mr. Rosenau:

This is in response to your two letters dated July 15, 2013, regarding your application for a prisoner transfer to Canada. With respect to your concern that we had not received letters in support of your transfer application, please be advised that we have now received twelve letters in support of your transfer from friends, family, and co-workers.

In one of your letters you asked this office to reconsider its decision denying your request for a prisoner transfer based on the terms of the plea agreement you signed. We recognize that paragraph 9 of your plea agreement provides that "[t]he United States agrees to take no position with regard to any request by Defendant for a treaty transfer made pursuant to a valid treaty with Canada." However, it should be noted that paragraph 15 of the same agreement specifically states that the agreement "binds only the United States Attorney's Office for the Western District of Washington," and that it "does not bind any other . . . office or agency of the United States." Thus, the only commitment made was that the United States Attorney's Office for the Western District of Washington would refrain from taking a position regarding your transfer request. That office did not take a position, and it therefore abided by the terms of the plea agreement..

The authority to make transfer determinations has been vested by federal law in the Attorney General or his designee. See 18 U.S.C. § 4102. That authority has been delegated by the Attorney General to the Director and Associate Directors of the Office of Enforcement Operations in the Criminal Division of the U.S. Department of Justice. No other government official has the power to make the transfer decision or to promise that transfer will occur.

Although you indicate that you were led to believe that "the United States" would not object to your request for a transfer, and that this was one of the reasons you proceeded with the plea agreement, the U.S. Attorney's Office has advised this office that there was no misunderstanding at the time that paragraph 9 only bound the U.S. Attorney's Office for the Western District of Washington, and that you and your attorney were told that the position of

that office would not be determinative of the final decision of the Office of Enforcement Operations. As a result, our decision in your case did not conflict with the terms of your plea agreement.

Sincerely,

*Paula A Wolff*

Paula A. Wolff, Chief
International Prisoner Transfer Unit